# ORIGINAL



D113840195 INI

## IN THE COURT OF COMMON PLEAS
## HAMILTON COUNTY, OHIO
### CIVIL DIVISION

| | | |
|---|---|---|
| **ERIN & JEFFREY GREELISH** | : | Case No.    A 1 6 0 1 5 3 9 |
| 1915 Emory Court | : | |
| Hebron, KY 41048 | : | JUDGE |
| | : | |
| **Plaintiff,** | : | |
| | : | **COMPLAINT** |
| **v.** | : | **& JURY DEMAND** |
| | : | |
| **ABUBAKAR ATIQ DURRANI, M.D.,** | : | (ALL NEW DR. DURRANI |
| Serve: Orthopedic & Spine Institute | : | CASES SHALL GO TO JUDGE |
| 203 Canal Road | : | RUEHLMAN PER HIS ORDER) |
| Lahore 54000 Pakistan | : | |
| (Serve by regular mail) | : | |
| | : | |
| And | : | |
| | : | |
| **CENTER FOR ADVANCED SPINE** | : | |
| **TECHNOLOGIES, INC.** | : | |
| Serve: Orthopedic & Spine Institute | : | |
| 203 Canal Road | : | |
| Lahore 54000 Pakistan | : | |
| (Serve by regular mail) | : | |
| | : | |
| And | : | |
| | : | |
| **WEST CHESTER HOSPITAL, LLC** | : | |
| 7700 UNIVERSITY DRIVE | : | |
| WEST CHESTER, OH 45069 | : | |
| | : | |
| SERVE: GH&R BUSINESS SVCS., INC. | : | |
| 511 WALNUT STREET | : | |
| 1900 FIFTH THIRD CENTER | : | |
| CINCINNATI, OH 45202 | : | |
| (Serve via Certified mail) | : | |
| | : | |
| And | : | |
| | : | |
| **UC HEALTH** | : | |
| SERVE: GH&R BUSINESS SVCS., INC. | : | |
| 511 WALNUT STREET | : | |
| 1900 FIFTH THIRD CENTER | : | |
| CINCINNATI, OH 45202 | : | |

REGULAR MAIL WAIVER

REGULAR MAIL WAIVER

*FILED*

2016 MAR 15 P 1: 47

TRACY WINKLER
CLERK OF COURTS
HAMILTON COUNTY, OH

1

**EXHIBIT A**

(Serve via Certified mail)                    :

And                                           :

                                              :

**JOURNEY LITE OF CINCINNATI, LLC:**
10475 READING RD., SUITE 115                  :
CINCINNATI, OH 45241                          :

                                              :

SERVE: CT CORPORATION SYSTEM                  :
1300 EAST NINTH STREET                        :   *REGULAR MAIL WAIVER*
CLEVELAND, OH 44114                           :
(Serve via Certified mail)                    :

                                              :

        **Defendants.**                       :

---

        Come now Plaintiffs, Erin and Jeffrey Greelish, and file this Complaint and jury

demand and state as follows:

1.      At all times relevant, Plaintiffs were residents of and domiciled in the State of

Kentucky.

2.      At all times relevant, Defendant Dr. Abubakar Atiq Durrani (hereinafter "Dr.

Durrani") was licensed to and did in fact practice medicine in the State of Ohio.

3.      At all times relevant, Center for Advanced Spine Technologies, Inc. (hereinafter

"CAST"), was licensed to and did in fact perform medical services in the State of Ohio,

and was and is a corporation authorized to transact business in the State of Ohio and

Kentucky.

4.      At all times relevant, Journey Lite of Cincinnati, LLC ("Journey Lite") was a

Delaware corporation transacting business and performing and managing medical

services in the State of Ohio and held itself out to the public, and specifically to the

Plaintiff as a center providing competent and qualified medical and nursing services, care

and treatment by and through its physicians, physicians in training, residents, nurses,

2

agents, ostensible agents, servants and/or employees.

5.     At all times relevant, West Chester Hospital, LLC (hereinafter "West Chester Hospital"), was a limited liability company authorized to transact business and perform medical services in the State of Ohio and operate under the trade name West Chester Hospital.

6.     At all times relevant, Defendant UC Health Inc., was a duly licensed corporation which owned, operated and/or managed multiple hospitals including, but not limited to West Chester Hospital, and which shared certain services, profits, and liabilities of hospitals including West Chester.

7.     At all times relevant herein, West Chester Medical Center, Inc., aka West Chester Hospital held itself out to the public, and specifically to Plaintiffs, as a hospital providing competent and qualified medical and nursing services, care and treatment by and through its physicians, physicians in training, residents, nurses, agents, ostensible agents, servants and/or employees.

8.     UC Health is the corporate parent, owner and operator of West Chester Hospital, LLC.

9.   · UC Health Stored BMP-2 at UC Health Business Center warehouse located in Hamilton County.

10.    UC Health is the corporate parent, owner and operator of West Chester Hospital, LLC. UC Health is located in Hamilton County making Hamilton County appropriate to bring this lawsuit.

11.    The subject matter of the Complaint arises out of medical treatment by Defendants in Hamilton County, Ohio.

12.    The amount in controversy exceeds the jurisdictional threshold of this Court.

13.    This case has been previously dismissed pursuant to Civ. R. 41(A)(1)(a) and is now being refiled within the time allowed by O.R.C. 2305.19.

## FACTUAL ALLEGATIONS OF PLAINTIFF

14.    Plaintiff was referred to Dr. Durrani in 2011 by Dr. Brad Tinkle of Cincinnati Children's Hospital.

15.    At the time, Plaintiff was experiencing headaches that originated at the intersection of her spine and neck, and which caused her severe pain and dizziness.

16.    Dr. Durrani ordered Plaintiff to undergo MRI and CAT scan procedures.

17.    During his consultation with Plaintiff, Dr. Durrani applied pressure to the back of Plaintiff's head and neck, resulting in her losing consciousness.

18.    Dr. Durrani told the Plaintiff that she would need to have a fusion of C1-C2 as well as C1-Occiput or she would likely suffer an "internal decapitation."

19.    Dr. Durrani did not fully explore conservative treatment options prior to recommending this surgery.

20.    On December 21, 2011 Dr. Durrani performed surgery on the Plaintiff consisting of a cervical fusion from C1-C2 at West Chester Hospital ["the first surgery"].

21.    Upon information and belief, Dr. Durrani used Infuse/BMP-2 or Puregen "off-label" in this first surgery without Plaintiff's knowledge or consent, causing harm.

22.    Plaintiff received follow-up treatment from Dr. Durrani and CAST.

23.    After her six-week postoperative appointment, Plaintiff was given a cervical collar and told to "wean [herself] off of the collar."

24.    Plaintiff received no other physical therapy.

4

25.     Plaintiff began to suffer from different pains following this surgery, but was assured by Dr. Durrani that her recovery would likely be slow, but certain.

26.     Plaintiff also lost a measure of her mobility and flexibility in her neck after this surgery, and is unable to move her head through its full range of motion.

27.     Plaintiff returned to Dr. Durrani in late 2012 after she began to suffer from intense pain in the area of her previous surgery. Dr. Durrani ordered her to undergo more MRI procedures.

28.     Dr. Durrani told Plaintiff that he "really just needed to fix C5-C6," though the MRI report indicated that her previously operated on C1-C2 was not showing any signs of fusion.

29.     On November 16, 2012 Dr. Durrani performed surgery on the Plaintiff consisting of a cervical fusion from C5-C6 at Journey Lite ["the second surgery"].

30.     Upon information and belief, Dr. Durrani used Infuse/BMP-2 or Puregen "off-label" in this second surgery without Plaintiff's knowledge or consent, causing harm.

31.     Plaintiff continued to receive follow-up treatment from Dr. Durrani and CAST.

32.     Plaintiff continued to see Dr. Durrani until early 2013.

33.     Plaintiff now has a very limited range of motion and severe pain that radiates from the base of her skull. She suffers from constant, severe pain that has only intensified since her surgeries with Dr. Durrani.

34.     Upon information and belief, Dr. Durrani used Infuse/BMP-2 or Puregen "off-label" in this first surgery without Plaintiff's knowledge or consent, causing harm.

35.     The use of BMP-2 increases a person's chance of cancer by 3.5%

36. Due to the unnecessary surgeries Dr. Durrani performed, Plaintiff has a 3.5% increased chance of cancer because of the use of BMP-2.

37. As a direct and proximate result of the use and implementation of Infuse/BMP-2 Plaintiff has incurred a 3.5% increase in the risk of Cancer. As a result Plaintiff has an increased fear of Cancer.

38. Upon information and belief, the surgery performed by Dr. Durrani was medically unnecessary and improperly performed.

39. As a direct and proximate result of these surgeries and Dr. Durrani's negligence, the Plaintiffs have suffered harm.

40. Plaintiffs did not become aware of Dr. Durrani's use of Infuse/BMP-2 until legal counsel reviewed Plaintiffs' bills.

## MORE SPECIFIC ALLEGATIONS BASED UPON DISCOVERY AND DEPOSITION TESTIMONY

41. This information is to demonstrate the overall negligence and inappropriate actions of Dr. Durrani and the hospitals he worked with and/or for and/or in an individual capacity.

42. Krissy Probst was Dr. Durrani's professional and personal assistant handling professional, academic, travel, surgery scheduling, his journals, his Boards, his credentialing, his personal affairs and his bills.

43. Krissy Probst worked as Dr. Durrani's assistant for three years at Children's Hospital from 2006, 2007, and 2008.

44. Krissy Probst reported Dr. Durrani to Sandy Singleton, the Business Director at Children's for his having an affair with Jamie Moor, his physician assistant.

6

45.     Krissy Probst resigned in 2008 from Dr. Durrani and remained working for three other surgeons in the Orthopedic Department.

46.     Krissy Probst worked in the Orthopedic Department for eleven years from 2002-2013. She retired in May, 2013.

47.     Krissy Probst confirmed Dr. Durrani claims being a Prince, when he is not.

48.     According to Krissy Probst, Dr. Crawford, an icon in pediatric orthopedics treated Dr. Durrani "like a son."

49.     According to Krissy Probst, Dr. Crawford, Chief of Orthopedics at Children's unconditionally supported Dr. Durrani no matter the issues and problems Dr. Durrani faced.

50.     Dr. Durrani's patient care at Children's Hospital dropped off considerably after Jamie Moor became his physician assistant and they began their affair.

51.     Dr. Durrani was the only orthopedic spine surgeon at Children's who would perform a dangerous high volume of surgeries.

52.     At Children's, Dr. Durrani would begin a surgery, leave and have fellows and residents complete a surgery or do the full surgery while he was in his office with Jamie Moor, his physician assistant for four or five hours.

53.     Children's Board and administration knew about Dr. Durrani doing too many surgeries and not properly doing the surgeries. They did nothing.

54.     Dr. Durrani argued to Children's administration when they complained to him that he made them money so Children's tolerated him and allowed him to do what he wanted.

7

55. Dr. Durrani, when told by Children's that Jamie Moor had to leave, told Children's that he would leave too.

56. Dr. Agabagi would do one spine patient a day at Children's because it takes normally eight hours for a full fusion.

57. Dr. Durrani would schedule two to three spine surgeries a day at Children's.

58. Dr. Durrani would repeatedly have the Business Director, Sandy Singleton, or OR Director allow him to add surgeries claiming they were emergencies when they were not.

59. Dr. Durrani would leave a spine surgery patient for four or five hours in the surgery suite under the care of fellows or residents, unsupervised and sit in his office and check on the surgery as he pleased.

60. Dr. Peter Stern did not like Dr. Durrani while Dr. Durrani was at Children's because he knew all about his patient safety risk issues. Yet, Dr. Stern supported, aided and abetted Dr. Durrani's arrival at West Chester. It defies comprehension, but was for one of the world's oldest motives—greed of money.

61. There is also a Dr. Peter Sturm, an orthopedic at Children's who also had no use for Dr. Durrani.

62. Dr. Durrani chose his own codes for Children's billing which he manipulated with the full knowledge of Children's Board and management.

63. Dr. Durrani was dating and living with Beth Garrett, a nursing school drop-out, with the full knowledge of his wife Shazia.

64. Dr. Durrani was close with David Rattigan until David Rattigan pursued Jamie Moor and Dr. Durrani would not allow David Rattigan in the OR at Children's for a long time.

65.     Dr. Durrani, while claiming to have riches, does not. Dr. Durrani's wife's family paid for Dr. Durrani's education and it is her family with the significant wealth.

66.     Medtronics paid for Dr. Durrani's trips and paid him $10,000 fees for speaking or simply showing up at a spine conference.

67.     Krissy Probst's business director told her to save all Dr. Durrani related documents and information and she did.

68.     While doing research at Children's, Dr. Durrani would misstate facts regarding his research. Children's knew he did this.

69.     Dr. Durrani ended on such bad terms with Children's Hospital he was not allowed on the premises after his departure in December 2008, yet he performed a spine surgery there in February 2009.

70.     Eric J. Wall, MD was the Director of Surgical Services Division of Pediatric Orthopedic Surgery when Dr. Durrani left Children's.

71.     Sandy Singleton, MBA was the Senior Business Director of Surgical Services Division of Pediatric Orthopedic Surgery when Dr. Durrani left Children's.

72.     On information and belief, Dr. Durrani used his relationships with Children's officials to purge his Children's file of all patient safety and legal issues which had occurred as part of his departure "deal" which Defendants hide with privilege.

**INFUSE/BMP-2**

**I.      BACKGROUND INFORMATION**

73.     The Deters Law Firm, P.S.C., represents approximately 500 Plaintiffs in medical malpractice actions against a former Northern Kentucky/Cincinnati-area spine surgeon named Abubakar Atiq Dr. Durrani (Dr. Durrani), his company, Center for Advanced

Spine Technologies, Inc. (CAST), and several area hospitals including, but not limited to, West Chester Hospital (WCH), University of Cincinnati Health (UC Health), Cincinnati Children's Hospital Medical Center (CCHMC), Christ Hospital, Deaconess Hospital, Good Samaritan Hospital and Journey Lite of Cincinnati, LLC (Journey Lite) (collectively Hospitals).

74. Dr. Durrani performed unnecessary, fraudulent, dangerous, and ultimately damaging surgeries on these Plaintiffs while working for and with these Hospitals.

75. The scheme and artifice to defraud that Dr. Durrani devised, executed, and attempted to execute while working for and with the Hospitals included the following patterns and practices:

    a.   Dr. Durrani persuaded the patient that surgery was the only option, when in fact the patient did not need surgery.

    b.   Dr. Durrani told the patient that the medical situation was urgent and required immediate surgery. He also falsely told the patient that he/she was at risk of grave injuries without the surgery.

    c.   Dr. Durrani often told his cervical spine patients that they risked paralysis or that his/her head would fall off if he/she was involved in a car accident, ostensibly because there was almost nothing attaching the head to the patient's body.

    d.   Dr. Durrani often ordered imaging studies such as x-rays, CT scans, or MRIs for patients but either did not read or ignored the resulting radiology reports.

    e.   Dr. Durrani often provided his own exaggerated and dire reading of the patient's imaging study that was either inconsistent with or was plainly contradicted by the radiologist's report. At times, Dr. Durrani provided a false reading of the imaging.

    f.   Dr. Durrani often dictated that he had performed certain physical examinations and procedures on patients that he did not actually perform.

g.   Dr. Durrani often ordered a pain injection for a level of the spine that was inconsistent with the pain stated by the patient or with that indicated by the imaging. Dr. Durrani also scheduled patients for surgeries without learning of or waiting for the results of certain pain injections or related therapies.

h.   Dr. Durrani often dictated his operative reports or other patient records months after the actual treatment had occurred.

i.   Dr. Durrani's operative reports and treatment records contained false statements about the patient's diagnosis, the procedure performed, and the instrumentation used in the procedure.

j.   When a patient experienced complications resulting from the surgery, Dr. Durrani at times failed to inform the patient of, or misrepresented the nature of, the complications.

k.   All of the above-mentioned actions were done with the knowledge, cooperation, or intentional ignorance of the Hospitals because Dr. Durrani was one of the biggest moneymakers for the Hospitals.

76.   In addition to the civil medical malpractice actions against Dr. Durrani, on August 7, 2013, he was indicted by the Federal Government for performing unnecessary surgeries and for defrauding the Medicare and Medicaid programs. Specifically, the ten-count complaint charged Dr. Durrani with health care fraud, in violation of 18 U.S.C. § 1347, and making false statements in health care matters, in violation of 18 U.S.C. § 1035. There was a subsequent superseding indictment adding over 30 counts.

77.   Following these criminal indictments, in December of 2013 and prior to the first Plaintiff's trial in these actions, Dr. Durrani fled the United States and returned to Pakistan. He has not returned to the United States to face allegations of either criminal or civil liability.

11

78.     Among Dr. Durrani's and the Hospitals' professional failings was the use of a synthetic bone-morphogenetic protein called BMP-2, which was marketed under the trade name "Infuse." Dr. Durrani used BMP-2/Infuse in ways that were either not approved by the federal Food and Drug Administration (FDA) or that were specifically contraindicated as noted on the FDA-approved product labeling. The Defendants had full knowledge of this fact.

79.     BMP-2/Infuse was, at the time of the surgeries in question, and currently still is manufactured by a company called Medtronic, Inc. (Medtronic).

80.     Dr. Durrani predominantly used BMP-2/Infuse on patients at WCH, which is owned by UC Health.

81.     It is Plaintiffs' position that this non-FDA-approved use of BMP-2/Infuse was not only negligent, and fraudulent, but criminal based upon the manner in which it was allowed to be used by Dr. Durrani at West Chester, all with the knowledge and full support of the Defendants.

## II.     THE PLAYERS REGARDING BMP-2

82.  Dr. Durrani is a citizen of the Republic of Pakistan and was a permanent resident of the United States who, from approximately 2005 to 2013, worked as a spine surgeon in and around Cincinnati, Ohio, until he fled the United States to escape civil liability and criminal prosecution.

83.  Medtronic is an Irish corporation, with its principal executive office located in Dublin, Ireland, and its operational headquarters located in Minneapolis, Minnesota. Medtronic is the world's third largest medical device company and manufactures and markets BMP-

2/Infuse. Medtronic sales representatives were also present during the experimental surgeries performed on Plaintiffs, who are clients of the Deters Law Firm.

84.  CAST was a corporation organized under the laws of Ohio and had business and medical offices in Florence, Kentucky and Evendale, Ohio. CAST was owned, in whole or in part, by Dr. Durrani.

85.  Bahler Medical, Inc. is a manufacturer of medical implants and is a corporation located in the state of Ohio.

86.  David Rattigan is an Ohio resident and was and is a sales representative for Medtronic. Further, he is affiliated with Bahler Medical, Inc., was involved in many of the transactions involving BMP-2, and was present for the experimental surgeries in which BMP-2 was used.

87.  West Chester Hospital, LLC is a corporation organized under the laws of Ohio. It provides medical facilities and billing support to physicians, including Dr. Durrani, in the state of Ohio. WCH is owned by UC Health.

88.  UC Health is a private, non-profit corporation organized under the laws of Ohio. It provides medical facilities, management, administrative, ancillary, and billing support to physicians, and it owns WCH.

89.  CCHMC is a medical facility in Ohio where Dr. Durrani was an employee until approximately 2008.

## III.    WHAT IS BMP-2/INFUSE?

90.     The full name of BMP-2 is "Recombinant Human Morphogenetic Protein-2" (also called rhBMP-2). The following definitions apply:

     a.  Recombinant – Artificially created in a lab;

     b.  Morphogenetic – Evolutionary development of an organism;

13

   c. Protein – Essential for growth and repair of tissue.

91. Recombinant human protein (rhBMP-2) is currently available for orthopedic usage in the United States.

92. Medtronic manufactured, marketed, sold, and distributed BMP-2 under the trade name "Infuse."

93. BMP-2 has been shown to stimulate the production of bone.

94. Implantation of BMP-2 in a collagen sponge induces new bone formation and can be used for the treatment of bony defects, delayed union, and non-union.

**BMP-2 AS A BIOLOGIC**

95. BMP-2 is not a device, but instead it is a biologic. *See* July 2009 American Medical Association Article and 2011 Stanford School of Medicine Article.

96. According to the FDA, "[a] 'biological product' means a virus, therapeutic serum, toxin, antitoxin, vaccine, blood, blood component or derivative, allergenic product, or analogous product, or arsphenamine or derivative of arsphenamine (or any other trivalent organic arsenic compound), applicable to the prevention, treatment, or cure of a disease or condition of human beings (Public Health Service ActSec.351(i)1."Available http://www.fda.gov/ICECI/Inspections/IOM/ucm122535.htm.

97. BMP-2 is a Bone-Morphogenetic Protein that is used to promote bone creation and remolding and falls under the definition of a biologic. *See* AMA article ("bone forming properties") and Stanford Article. BMP-2 differs from a medical device in that once implanted, it can only be removed days after surgery. If a patient had a complication due to BMP-2 and did not discover this complication until year after

14

surgery, the patient could not have BMP-2 removed to reduce the complication because BMP-2 is so integrated into the patient's bone.

98.     A patient has a right to determine what happens to his or her body and the preservation of that right requires that the patient be informed when a bone growth product, that causes irreversible harm, is placed in his or her body.

**WHEN IS IT USED?**

99.     Recombinant human BMPs are used in orthopedic applications such as spinal fusions, non-unions, and oral surgery.

100.    The bone graft contains two parts. The first is a solution of human bone growth protein or morphogenetic protein-2. This protein is found in the human body in small dosages and is important for the healing and formation of bones. The protein is genetically engineered to be utilized in the Infuse Bone Graft product, and it is employed for the stimulation of formation and growth in bones.

101.    The second part of the bone graft is an absorbable collagen sponge.

102.    Both components of the Infuse Bone Graft structure are used to fill the LT-Cage Lumbar Tapered Fusion Device. This chamber is intended to restore the deteriorated disc space to its original height.

103.    FDA-approved use for the Infuse Bone Graft product is only for lower back surgery using an anterior lumbar interbody fusion (ALIF), a technique where the operation on the spine is conducted through the abdomen.

104.    In addition, the Infuse Bone Graft product must be used in conjunction with Medtronic's LT-Cage. Use of BMP-2 without the LT-Cage is considered an "off-label" use.

15

**CONTRAINDICATIONS OF USE**

105. The FDA specifically warns against the use of Infuse in the cervical spine, citing reports of "life-threatening complications."

106. Any use of Infuse other than in lumbar spine surgeries with the LT-Cage is considered "off-label" use

107. Infuse should never be used on the skeletally immature patient, i.e., in patients less than 18 years of age or those with no radiographic evidence of epiphyseal closure.

108. Infuse should never be used in the vicinity of a resected or extant tumor.

109. Infuse should never be used in those patients known to have active infection at the surgical site.

**RISKS ASSOCIATED WITH OFF-LABEL USE**

110. When used in an off-label manner, patients may experience problems with pregnancy, including but not limited to: complications in fetal development; allergic reactions to titanium, bovine type I collagen, or bone morphogenetic protein–2; infection; the creation or intensification of tumors; liver or kidney disease; lupus or human immunodeficiency virus (HIV/AIDS); problems with radiation, chemotherapy, or steroids if a patient is malignant; paralysis; bowel and/or bladder dysfunctions; sexual disorders, including sterilization and incompetence; respiratory failure; excessive bleeding, and; death.

**IV.    THE REGULATORY PROCESS**

111.    The Medical Device Amendments (MDA) to the federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 et seq., established two separate approval processes for medical devices: Pre–Market Approval (PMA) and Pre–Market Notification.[1]

112.    The FDA's PMA process is lengthy and involves extensive investigation by the FDA. The PMA application requires manufacturers to submit extensive animal and human data to establish their devices' safety and effectiveness. 21 C.F.R. § 814.20. Frequently, an experimental program under close FDA scrutiny must be successfully completed before FDA approval can be obtained under this process. FDA regulations also require PMA applicants to submit copies of all proposed labeling for the device. 21 C.F.R. § 814.20(b)(10). The FDA approves a PMA application only after extensive review by the agency and an advisory committee composed of outside experts. 21 C.F.R. § 814.40.[2]

113.    In contrast, the FDA's Pre–Market Notification process is more abbreviated and involves less FDA oversight. This process requires applicants to submit descriptions of their devices and other information necessary for the agency to determine whether the devices are substantially equivalent. Pre–Market Notification applicants must also submit their proposed labeling. 21 C.F.R. § 807.87. If the FDA determines that a device is substantially equivalent to a device that was on the market prior to the enactment of the MDA in 1976, the applicant is free to market the device.

---

[1] *Fender v. Medtronic*, 887 F.Supp. 1326 fn 1 (E.D. Cal.1995).

[2] *Fender v. Medtronic*, 887 F.Supp. 1326 fn 1 (E.D. Cal.1995).

114. BMP-2 received PMA (PMA number P000058) for the Infuse/BMP-2 Lumbar Tapered Fusion Device, which PMA provided for limited use with specific requirements for its use on individuals. See Medtronic Package Insert.

## SCOPE OF THE PMA AND PRODUCT LABELING

115. The PMA for BMP-2 provided that the product may only be used in patients with the following characteristics:

d. Skeletally mature patient, AND

e. At levels L2-S1, AND

f. Confirmed degenerative disc disease (DDD), AND

g. Using only an open anterior or anterior laparoscopic approach, AND[3]

h. Six months of non-operative treatment prior to treatment with the device, AND

i. In combination with the metallic LT-CAGE.[4]

See Medtronic Package Insert, "INDICATIONS."

116. According to Medtronic's package insert for BMP-2/Infuse as well as other industry literature, the following risks are associated with the use of BMP-2/Infuse:

A. Male Sterility

B. Cancer

C. Increased progression of cancer

D. Suffocation of the cervical region

E. Bone fracture

F. Bowel/bladder problems

---

[3] The anterior interbody fusion approach was developed because the risk of non-union (pseudarthrosis) is significantly higher in posterior approaches. The biggest risk factor for fusion surgery is non-union.

[4] Instrumented fusions involve hardware and are more stable fusions with a shorter recovery time than non-instrumented fusions.

G.    Loss of spinal mobility or function

H.    Change in mental status

I.    Damage to blood vessels and cardiovascular system compromise

J.    Excessive bone mass blocking the ability to treat pain

K.    Damage to internal organs and connective tissue

L.    Death

M.    Respiratory problems

N.    Disassembly and migration of components

O.    Dural tears

P.    Ectopic and exuberant bone formation

Q.    Fetal development complications (birth defects)

R.    Foreign body (allergic) reaction

S.    Gastrointestinal complications

T.    Incisional complications

U.    Infection

V.    Insufflation complications

W.    Neurological system compromise

X.    Non-union

Y.    Delayed union

Z.    Mal-union

AA.    Change in curvature of spine

BB.    Retrograde ejaculation

CC.    Scars

DD.    Tissue and nerve damage

EE.    Itching

19

FF.   Pain

GG.   Hematoma

HH.   Anaphylactic reaction

II.   Elevated erythrocyte sedimentation rate

117.   Injury Percentages:

j.   Ectopic Bone Growth-63%

k.   Inflammatory Neuritis-15%

l.   Osteolysis/Subsidence-13%

m.   Acute Swelling-7%

n.   Retrograde Ejaculation-2%

o.   85% of time, BMP-2 implanted in off-label use

118.   Not a single one of these risks in the last two paragraphs were ever explained to a single patient at Children's Hospital by Dr. Durrani.

119.   BMP-2 was NOT approved by the FDA for use in the cervical and thoracic spine and BMP-2 was NOT safe or approved for use in children less than 21 years of age. These uses are considered "off-label."

**"OFF-LABEL" USE**

120.   A use of a device is considered "off-label" if it is not approved under the Pre-Market Approval process OR cleared for such use pursuant to 21 U.S.C. § 360c(f) (also known as "the 510k premarket notification process").

121.   Infuse can be implanted in an off-label manner in three ways:

p.   Approach/position: Any approach other than an anterior approach;

q.   Product: Failure to use LT-Cage (or any cage); mixing rhBMP-2 with other grafting products like Allograft or Autograft;

r.   Discs: Use on multiple levels or on a level outside of L2-S1.

20

122. Dr. Durrani and the Hospitals in which he performed surgeries repeatedly used BMP-2 in these non-FDA-approved manners.

## THE NON-COMPLIANCE WITH THE REGULATORY PROCESS

123. The PMA 000058 "Conditions of Approval" specifies the following condition: "Before making any change affecting the safety or effectiveness of the device, submit a PMA supplement for review and approval by the FDA ... [a] PMA supplement or alternate submission shall comply with applicable requirements under 21 C.F.R. 814.39[.]"

124. 21 C.F.R. 814.39 requires a PMA supplement pursuant to subsection (a)(1) for new indications of use of the device and pursuant to subsection (a)(6) for changes in components.

125. The PMA 000058 "Conditions of Approval" notes the post-marketing reporting requirement imposed by 21 C.F.R. 814.84, particularly "Identification of changes described in 21 C.F.R. 814.39(a)." Medtronic did not comply with this requirement relating to the intended uses and componentry.

126. The FDA can impose post-approval requirements in the PMA pursuant to 21 C.F.R. 814.82, and this fact results in the device being characterized as "restricted" pursuant to 21 U.S.C. § 360j(e) for purposes of 21 U.S.C. § 352(q). Section 352(q) states that any restricted device that is distributed or offered for sale with false or misleading advertising is "misbranded."

127. "Indications for use" is a necessary part of the PMA application and the "Indications for use" are required to be limited by the application. Any different use is inconsistent with the PMA.

128. A device that fails to meet the requirements of the PMA or 21 C.F.R. 814 is "adulterated" as defined by 21 U.S.C. § 351(f).

129. 21 C.F.R. 801.6 defines a misleading statement related to a DIFFERENT device contained in the label delivered with the device intended to be used will render the device to be used misbranded.

130. Medtronic did not apply for a PMA supplement, as required by the FDA generally and PMA 000058 specifically, for the off-label uses, nor did it provide warnings of the risks known about the off-label uses. All named Defendants in these cases knew about the occurrences of off-label use.

131. The PMA requires an application prior to marketing for new indicated uses by incorporating the federal requirements and explicitly reciting the text of 21 C.F.R. 814.39 and 814.84 and by specifically stating the range of indicated uses on the PMA.

## V. MEDTRONIC

132. In or about 2001, Medtronic began preparing for the launch of two spinal fusion products, PYRAMID and INFUSE (BMP-2), which it projected would enjoy broad application with spinal surgeons and their patients on a nationwide basis.

133. Medtronic anticipated that both products would initially be limited in application.

134. Motivated by greed and a desire to gain competitive advantage in the marketplace, Medtronic began a course of conduct designed to broaden the application of both products by end-users. The course of conduct involved fraud, false statements, material misrepresentation, and deceit for the purpose of broadening the sales of these products beyond that which the usual acceptance within the scientific community or regulatory approval would otherwise allow.

135. On or after July 2, 2002, Medtronic received notification that its Pre-Market Approval application for its BMP-2/Infuse bone graft products had been approved by the FDA. However, such approval was limited to the application of the device from the L4 through S1 levels. Further, the approval mandated the conduct of post-approval studies to evaluate the long-term performance of the BMP-2 bone graft and to study the potential side effects and complications such as the promotion of tumors by the bone morphogenetic protein component of BMP-2. Other studies were conducted as well. See "Allegations against Medtronic in the Unsealed Mississippi False Claims Case."

136. Medtronic engaged in a fraudulent course of conduct designed to maximize its revenues from BMP-2, regardless of whether it would eventually be allowed to remain on the market.

137. One of the physicians Medtronic co-opted into its fraudulent scheme was a Thomas A. Zdeblick, M.D. Dr. Zdeblick was an orthopedic surgeon whose invention, the LT-Cage, was the only approved device to act as the delivery vehicle for BMP-2 into the body.

138. Dr. Zdeblick enjoyed a position within the scientific community as a Key Opinion Leader, and he was both a practicing orthopedic surgeon and professor at the University of Wisconsin.

139. In one of Dr. Zdeblick's first attempts to tout his LT-Cage and rhBMP-2, which would become the active ingredient in the ultimate Infuse/BMP-2 product, he encountered some drawbacks to his goal of promoting his and Medtronic's products, which arose from the policy of certain industry journals, including the journal *Spine,*

23

which followed industry standards before printing peer-reviewed material. See article in the journal *Spine,* published in 2000.

140.     Not only were the drawbacks related to industry publishing standards, but the National Consumer Health Information and Health Promotion Act of 1976 enacted certain provisions at 42 U.S.C. § 300u, et seq., whereby the Federal Government had entered the field of medical research publication. Such standards promulgated by the Secretary of the predecessor to the U.S. Department of Health and Human Services required that applications for grants and contracts must be subject to "appropriate peer review." See 42 U.S.C. § 300u-1.

141.     The drawbacks encountered with the peer-reviewed *Spine* article were as follows:

   a.     Attribution that the study was "sponsored by Medtronic Sofamor Danek, Inc.;"

   b.     The study was conducted under FDA regulations, and was "…designed as a prospective, multicenter, nonblinded, randomized, and controlled pilot study;" and

   c.     It was accompanied by a cautionary comment, or Point of View, which minimized the exuberance and import of the article.

142.     In the article, BMP-2 was touted by Zdeblick and the co-authors as the potential realization of a dream of Dr. Marshall Urist, a revered pioneer in the industry and discoverer of BMP, where it closed with the following: "…it is encouraging to note that Marshall Urist's seminal observation made more than 34 years ago may finally come to clinical fruition."

143.     In the Point of View, a Dr. John O'Brien of London questioned whether there could be long-term problems associated with the product. He treated Zdeblick's study

with caution and pointed out that simple plaster of Paris has achieved the same or similar results more than 50 years prior. He posited that, "[p]erhaps vascularization…fixation procedures are as important as the biochemical composition of the 'filler.'"

144.    Vascularization is achieved through removal of the disc material between two vertebral bodies and then the scraping of the surfaces of the vertebral bodies in a fusion procedure; fixation is the process of securing the motion segment through medical hardware. In other, if the alternative proposed by Dr. O'Brien proved to achieve equivalent or better results, Zdeblick and Medtronic's Infuse/BMP-2 products would be useless and unnecessary.

145.    Certain efforts would follow in an attempt to alleviate the drawbacks encountered with the 2000 *Spine* journal article.

146.    In 2002, Dr. Zdeblick was installed as the sole editor-in-chief of a medical journal known prior to his installation as the *Journal of Spinal Disorders*. Prior to his installation, the journal enjoyed a fourteen year history under the co-editorship of Dr. Dan Spangler and Dr. Tom Ducker. Once installed, Dr. Zdeblick successfully supplanted Drs. Dan Spengler and Tom Ducker and became the sole editor-in-chief, a position which would enable him to have greater control and would aid his participation in the fraudulent scheme.

147.    During this same time period, Dr. Zdeblick also enjoyed a position on the associate editorial board of the medical journal *Spine*, the leading publication covering all disciplines relating to the spine.

148.    In one of Dr. Zdeblick's actions as editor-in-chief, he set about re-purposing the journal in a way that would aid him in the furtherance of the fraudulent scheme through the streamlining of the publication process.

149.    In furtherance of the fraudulent scheme, Dr. Zdeblick re-purposed the journal and renamed it the *Journal of Spinal Disorders and Techniques* (JSDT), announcing that the new journal was "entering a new partnership with *Spine*." As part of this partnership, *Spine* would "continue to function as a broad-based scientific journal" tailored to both clinicians and scientists. However, the *Journal of Spinal Disorders and Techniques* would be directed solely to physicians in clinical practice.

150.    Dr. Zdeblick's stated goal was "to provide a forum for up-to-date techniques…", and in furtherance of that goal, Dr. Zdeblick announced that his journal would publish Class II or better clinical articles but would "occasionally accept cutting edge articles with less than one year follow-up." To justify this streamlined process, Dr. Zdeblick claimed as his goal the ability of his journal "to keep up with the fast pace of progress in the treatment of spinal patients."

151.    Arm-in-arm with Medtronic and others, Dr. Zdeblick would in short order abuse his position of trust as the editor-in-chief of JSDT.

152.    In the October 2002 edition, JSDT published an article entitled, "Anterior Lumbar Interbody Fusion using rhBMP-2 with Tapered Interbody Cages." This article was co-authored by, among others, Curtis A. Dickman, M.D., who was a developer of Medtronic's PYRAMID plate and who has been paid significant sums by Medtronic through royalty agreements, consulting agreements, and education training and speaking agreements.

26

153.    In addition to his interest in the PYRAMID plate, Dr. Dickman had assisted
Medtronic in the approval process for Infuse/BMP-2. As part of the pre-approval hearing
process, Dr. Dickman and his Barrow Neurological Associates Group of Phoenix,
Arizona had submitted a letter to the meeting of the FDA's Orthopedics and
Rehabilitation Devices Advisory Panel, which met on January 10, 2002. In that letter, Dr.
Dickman represented that "approval of BMP would provide a significant advance for
patient outcome and satisfaction following spinal fusion."

154.    In the October 2002 issue of JSDT touting the benefits of Infuse/BMP-2, Zdeblick
and others failed to disclose their financial ties to Medtronic, though industry standards
require such acknowledgement. Not only did Dr. Zdeblick fail to disclose that he profited
from each and every surgery which Infuse/BMP-2 was used through rights in the exclusive
delivery vehicle, his LT-Cage, but no reference whatsoever to their financial ties to
Medtronic was made either by Dr. Zdeblick or Dr. Dickman.

155.    For years, the recognized gold standard for spinal bone grafts has been the use of
autogenous bone, or bone harvested from the patient's own iliac crest, or hip bone.
Medtronic designed to have its Infuse/BMP-2 product supplant autogenous bone as the
gold standard in the medical community, and utilized false statements, a fraudulent
enterprise and the support of Federal funds to do so.

156.    As part and parcel of Medtronic's fraudulent scheme, the October 2002 study was
published in Dr. Zdeblick's journal three months after Medtronic received FDA approval
for Infuse. As the article shows, it was actually received on March 28, 2002 or after Dr.
Zdeblick had accomplished installment as the editor-in-chief, and was accepted by Dr.
Zdeblick's journal for publication on July 30, 2002.

27

157.   At the same time Dr. Zdeblick's journal was publishing the initial article on Infuse, Dr. Zdeblick was already finalizing and preparing for subsequent publication a follow-up article to tout Infuse potentially as the new gold standard. A second article, co-authored by Dr. Zdeblick and two other co-authors of the original article, was entitled "Is Infuse Bone Graft Superior to Autograft Bone? An Integrated Analysis of Clinical Trials using the LT-Cage Lumbar Tapered Fusion Device."

158.   This second article was published in Vol. 2 of 2003 and once again, there was no mention of Dr. Zdeblick's financial ties to Medtronic.

159.   This second article would serve as the second covert advertisement for the Infuse product, and the article states that "the purpose of our analysis was to investigate the potential statistical superiority of Infuse bone graft to autograft…"

160.   This second article went on to announce the July 2002 FDA approval of rhBMP-2.

161.   This article included as an "acknowledgment" an expression of gratitude to the physicians "who provided patients for this study and to the clinic research group at Medtronic Sofamor Danek for their help in data collection and statistical analyses." However, the article still failed to advise the medical community that some or all of the authors reaching these conclusions touted as monumental had direct financial interests tied to those conclusions.

162.   Rather, the failure to report these clear conflicts of interest on the part of those holding positions of trust both within the medical community and over patients was part of Medtronic's fraudulent enterprise. However, unchecked by appropriate peer review, Medtronic was able to systematically accomplish their goals.

163. In its 2003 Annual Report, and without recognizing that Zdeblick was being paid by Medtronic, Medtronic cited to Zdeblick's 2003 as reporting that Infuse "…may become the new gold standard in spinal fusion surgery."

164. By its 2006 Annual Report, if not earlier, Medtronic had removed all doubt, declaring that after its introduction in 2002, "Infuse Bone Graft quickly became the gold standard for certain types of lumbar fusion."

165. Medtronic's fraudulent scheme was successful and resulted in a revenue stream ranging from 700 to 900 million dollars per year.

166. It has been reported that around the same time these stories about Infuse were published, editors at the Spine Journal began receiving complaints from doctors around the country who were pointing out contradictions between papers published by doctors with financial ties to Medtronic and other data involving Infuse complications.' See *Journal Sentinel* article of John Fauber.

167. Through the use of these sham consulting, royalty and education/training agreements with its physician agents in this fraudulent enterprise, Medtronic has reaped windfalls in the billions of dollars. Medtronic has used this fraudulent enterprise and civil conspiracy to drive its vast profits and enhance its market position beyond that which it would have realized without engaging willfully, knowingly and potentially deliberate, conscious, or reckless indifference in the fraudulent enterprise and fraudulent concealment. See Mississippi case.

168. Defendants had full knowledge of all these facts pertaining to Medtronics. .

29

## VI.    FDA PUBLIC HEALTH NOTIFICATION

169.    On July 1, 2008 the FDA issued a Public Health Notification entitled "Life-Threatening Complications Associated with Recombinant Human Bone Morphogenetic Protein in Cervical Spine Fusion."

170.    This notification was sent to health care practitioners all across the United States warning of the complications associated with BMP-2, specifically when used in the cervical spine.

171.    In the notification the FDA stated they received at least 38 reports of complications during the prior four years with the use of BMP-2 in cervical spine fusions.

172.    The complications were associated with swelling of the neck and throat areas, which resulted in compression of the airway and/or neurological structures in the neck.

173.    Some reports describe difficulty swallowing, breathing or speaking and severe dysphagia following cervical spine fusion using BMP-2 products had also been reported.

174.    The notification further stated that, "since the safety and effectiveness of rhBMP for treatment of cervical spine conditions has not been demonstrated, and in light of the serious adverse events described above, FDA recommends that practitioners either use approved alternative treatments or consider enrolling as investigators in approved clinical studies.

175.    The Notification further emphasized the importance of fully informing patients of these potential risks and said that patients treated with BMP-2 in the cervical spine should know:

s.    The signs and symptoms of airway complications, including difficulty breathing or swallowing, or swelling of the neck, tongue, mouth, throat and shoulders or upper chest area

30

t. That they need to seek medical attention immediately at the first sign of an airway complication

u. That they need to be especially watchful 2-14 days after the procedure when airway complications are more likely to occur

v. rhBMP-2 (contained in Infuse Bone Graft) has received pre-market approval for fusion of the lumbar spine in skeletally mature patients with degenerative disc disease at one level from L2-S1 and for healing of acute, open tibial shaft fractures stabilized with an IM nail and treated within 14 days of the initial injury.

176. Additionally, BMP is not approved in any manner for use in patients who are skeletally immature (<18 years of age) or pregnant.

177. Dr. Durrani and the Hospitals ignored ALL of these warnings and used BMP-2 in cervical spine surgeries, children, and those with known compromising factors such as osteoporosis, smoking, and diabetes.

178. Furthermore, the Notification stated that the FDA requires hospitals and other user facilities to report deaths and serious injuries associated with the use of medical devices.

179. The Hospitals that allowed Dr. Durrani to use BMP-2 in their facilities failed to report any complications resulting from his use of BMP-2.

## VII. SENATE FINANCE COMMITTEE REPORT

180. Medtronic's actions did not go unnoticed, and in June of 2011 the Senate Finance Committee began an investigation into the fraudulent actions of Medtronic.

181. Medtronic produced more than 5,000 documents pertaining to 13 different studies of BMP-2 for the investigation.

31

182.    On October 25, 2012, Senate Finance Committee Chairman Max Baucus (D-Mont.) and senior member Chuck Grassley (R-Iowa) released the results of their 16-month investigation into Medtronic, which revealed questionable ties between the medical technology company and the physician consultants tasked with testing and reviewing Medtronic products.

183.    The investigation revealed that Medtronic employees collaborated with physician authors to edit and write segments of published studies on BMP-2/Infuse without publicly disclosing this collaboration.

184.    These fraudulently-produced studies may have inaccurately represented BMP-2's risks and may have placed added weight on the side effects of alternative treatments.

185.    The Senate investigation further found that Medtronic also maintained significant, previously undisclosed financial ties with physicians who authored studies about BMP-2, making $210 million in payments to physicians over a 15-year period.

186.    Senator Baucus stated, "Medtronic's actions violate the trust patients have in their medical care. Medical journal articles should convey an accurate picture of the risks and benefits of drugs and medical devices, but patients are at serious risk when companies distort the facts the way Medtronic has. Patients everywhere will be better served by a more open, honest system without this kind of collusion."

187.    Senator Grassley stated, "The findings also should prompt medical journals to take a very proactive approach to accounting for the content of the articles along with the authorship of the articles and the studies they feature. These publications are prestigious and influential, and their standing rests on rigorous science and objectivity. It's in the

32

interest of these journals to take action, and the public will benefit from more transparency and accountability on their part."

188. Major findings of the investigation include:

    a.    Medtronic was involved in drafting, editing, and shaping the content of medical journal articles authored by its physician consultants who received significant amounts of money through royalties and consulting fees from Medtronic. The company's role in authoring or substantially editing these articles was not disclosed in the published articles. Medical journals should ensure that any industry role in drafting articles or contributions to authors is fully disclosed.

    b.    Medtronic paid a total of approximately $210 million to physician authors of Medtronic-sponsored studies from November 1996 through December 2010 for consulting, royalty and other arrangements.

    c.    An e-mail exchange shows that a Medtronic employee recommended against publishing a complete list of adverse events, or side effects, possibly associated with BMP-2/Infuse in a 2005 *Journal of Bone and Joint Surgery* article.

    d.    Medtronic officials inserted language into studies that promoted BMP-2 as a better technique than an alternative by emphasizing the pain associated with the alternative.

    e.    Documents indicate that Medtronic prepared one expert's remarks to the FDA advisory panel meeting prior to BMP-2 being approved. At the time, the expert was a private physician but was later hired to be a vice president at Medtronic in 2007.

    f.    Medtronic documents show the company successfully attempted to adopt weaker safety rules for a clinical trial studying BMP-2 in the cervical spine that

33

would have allowed the company to continue the trial in the event that patients experienced severe swelling in the neck.

## VIII. YODA STUDY

189.    In response to the various controversies surrounding BMP-2/Infuse, including a June 2011 article in the journal *Spine,* the Yale University Open Data Access (YODA) team reached an agreement for Medtronic to provide full individual participant data from all their trials of rhBMP-2 and allow unrestricted independent re-analysis of this data.

190.    The YODA study involved research teams at two universities – the University of York and the Oregon Health and Science University.

191.    The review focused exclusively on the use of rhBMP-2 in patients undergoing spinal fusion surgery for treatment of degenerative disc disease, spondylolisthesis, or any other relevant spinal condition.

192.    The three main objectives of the study were: 1) to examine the potential benefits of BMP-2, 2) to examine the potential harms of BMP-2, and 3) to assess the reliability of the published evidence base.

193.    Medtronic submitted data from 17 studies, including 12 randomized controlled trials (RCTs).

194.    In total, the YODA study analyzed the data from 1,409 participants.

195.    Though the results showed moderate success with fusions as a result of BMP-2, the study found that BMP-2 results in several different complications including: arthritis, implant-related events, retrograde ejaculation, wound complications, and neurological, urogenital, and vascular events.

196.    In regard to the alleged tampering with the peer-reviewed studies by Medtronic, the YODA study found that only two out of twenty peer-reviewed journal publications reported a comprehensive list of all adverse events that occurred during the studies.

197.    Furthermore, the way in which adverse event data was presented in the literature was inconsistent, and the rationale for presenting some adverse events but not others was rarely clear.

198.    The study concluded that for the period up to 24 months after surgery, treatment with BMP-2 increases the probability of successful fusion (according to Medtronic definitions and reports, which the study noted "were subjective so it is not possible to confirm whether reported successful fusions truly were successful" see YODA Study, p. 35) but this does not translate to clinically meaningful benefits in pain reduction, function, or quality of life. The small benefits in these outcomes observed from six months onward come at the expense of more pain in the immediate post-operative period and a possible increased risk of cancer.

199.    Even more relevant to the case against Dr. Durrani and the Hospitals is the YODA study's conclusion that, "[i]t is very important that these findings are expressed clearly and discussed with patients so that they can make informed choices about the type of surgery they would prefer." *Id.*

200.    The University of Oregon Study determined that Infuse/BMP-2 is not better than Autograft, while the University of York study determined that Infuse/BMP-2 offers only a slight and not statistically significant advantage over Autograft.

201.    The YODA study concluded that Medtronic "misrepresented the effectiveness and harms through selective reporting, duplicate publication, and underreporting."

35

202. Adverse event categories such as heterotopic bone formation, osteolysis, and radiculitis were not included in participant databases or internal reports; therefore, the safety profile was not fully assessed.

203. The YODA study further concluded that Medtronic was involved in drafting, editing, and shaping the content of medical journal articles on Infuse/BMP-2 authored by its physician consultants who received significant amounts of money through royalties and consulting fees from Medtronic. The company's significant role in authoring or substantively editing these articles was not disclosed in the published articles.

204. Medtronic paid a total of approximately $210 million to the physician authors of Medtronic-sponsored studies on Infuse from November 1996 through 2010 for consulting, royalty and other arrangements.

205. An email exchange showed that a Medtronic employee recommended against publishing a complete list of adverse events or side effects possibly associated with Infuse in a 2005 *Journal of Bone and Joint Surgery* article.

206. Medtronic officials inserted language into studies that promoted Infuse as a better technique than an alternative procedure by overemphasizing the pain associated with the alternative procedure.

207. Medtronic's actions violated the trust patients have in their medical care. Medical journal articles should convey an accurate picture of the risks and benefits of drugs and medical devices, but patients are at serious risk when companies distort the facts the way Medtronic has. See United States Senate Committee on Finance, October 2012.

208. Infuse was intended for a single level anterior lumbar interbody fusion performed with all three components in a specific spinal region. The three components are a tapered

36

metallic spinal fusion cage (NOT PLASTIC), a recombinant human (BMP) bone Morphogenetic Protein, and a carrier/scaffold for the BMP and resulting bone. The Infuse product is inserted into the LT-CAGE Lumbar tapered Fusion Device component to form the complete Infuse Bone Graft/LT–Cage Lumbar Tapered Fusion Device. These components must be used as a system. The Infuse Bone Graft component must not be uses without the LT-Cage Lumbar Tapered Fusion Device component.

209.    BMP-2 is not supposed to be used in minors.

210.    BMP-2 is not supposed to be used with smokers and diabetics because of vascular slowing.

211.    BMP-2 should not be used with women in child bearing years.

212.    BMP-2 is contraindicated for patients with a known hypersensitivity to rhBMP-2 and should not be used in the vicinity of a resected or extant tumor, in patients with active malignancy, or in patients undergoing treatment for a malignancy.

## IX.    DR. DURRANI AND BMP-2

213.    Despite all of these warning signs, Dr. Durrani, with the full knowledge of the Defendants, continued to use BMP-2 in ways not approved by the FDA, or in an "off-label" manner.

214.    As early as 2007, Dr. Durrani and UC Health knew there were issues with BMP-2 because insurance companies such as Anthem were refusing to pay for BMP-2.

215.    Medtronic provided in writing to Dr. Durrani and CAST the approved uses for Infuse/BMP-2.

216.    However, Dr. Durrani and the Defendants continued to use BMP-2 in off-label ways, including but not limited to:

37

a.      Using BMP-2/Infuse in children, despite Medtronic specifically requiring it be used only in "skeletally mature patients;"

b.      Using it outside the L2-S1 level of the spine;

c.      Ignoring the requirement that BMP-2/Infuse only be used for Grade 1 spondylolisthesis or Grade 1 retrolisthesis;

d.      Not requiring at least six months of non-operative treatment prior to the use of BMP-2/Infuse;

e.      Using BMP-2/Infuse without the required cage;

f.      Not using the "carrier scaffold" in conjunction with BMP-2/Infuse as required;

g.      Using BMP-2/Infuse without proper training despite Medtronic's warning, "Caution: Federal (USA) law restricts this device to sale by or on the order of a physician with appropriate training or experience."

217.    Dr. Durrani was a paid consultant for Medtronic.

218.    According to Dr. Durrani's own deposition testimony in several cases, Medtronic required one of their representatives to be present in the operating room when its product BMP-2/Infuse is used.

219.    Because Medtronic representatives were present in these surgeries, Medtronic knew when Dr. Durrani used BMP-2/Infuse outside the approved uses according to Medtronic's own guidelines.

220.    Dr. Durrani was encouraged by Medtronic to obtain peer review and published studies from Medtronic sales representatives to support his use of BMP-2/Infuse.

221.    Dr. Durrani was encouraged by Medtronic to be an advocate for his patients and describe how BMP-2/Infuse technology can benefit them.

222. When asked how he got his Medtronic grant, Dr. Durrani responded, "You apply to the Medtronic's corporate and say this is what we want to do, like everybody else in the country applies, and then they come and evaluate the thing and say, "Okay, we think it's worthy. We'll give you the grant."

223. In regard to his role as a Medtronic consultant, Dr. Durrani stated, "If there are certain products that they help us in developing, then they will come to us for a certain consultant role for a certain product development."

224. Dr. Durrani also stated, "I was involved in the development of the minimally invasive spine instrumentation."

225. Dr. Durrani gave conflicting reports on his financial relationship with Medtronic.

226. In a deposition, when asked when his relationship with Medtronic began, Dr. Durrani responded "2000-it's 2003, '04. Something in that category. I'm not sure. It's on the Medtronic website. You can go look at it."

227. Medtronic's website has no information regarding their relationship with Dr. Durrani.

228. In another deposition, Dr. Durrani stated he began his relationship with Medtronic in "2005 or '06."

229. Dr. Durrani also gave conflicting reports on how much compensation he received from Medtronic for his consultation services.

230. In one deposition, Dr. Durrani stated in response to an inquiry as to how much payment he received, "It's a standard compensation. Again, it's on the website, how much they've paid us."

231. Again, this information is not available on the Medtronic website.

232.    In another deposition, when asked if he received income from Medtronic, Dr. Durrani replied, "No, I don't."

233.    When questioned further if he received a fee as a consultant, he stated, "If you do a work, there is a contractual obligation that they have to pay you. As I told you in my last deposition, they did declare it on their website, so you can actually go on the website and see how much they paid."

234.    In another deposition, Dr. Durrani stated that he received, "less than $10,000 in ten years" from Medtronic.

235.    An email dated July 30, 2008 from Medtronic Senior Product Manager Katie Stamps to Dr. Durrani states that she "is in the process of working on the renewal of your [Dr. Durrani's] consulting agreement." As stated, this information is not available on Medtronic's website, nor is any information relating to Dr. Durrani's role as a consultant for Medtronic.

236.    A CCHMC packet relating to its Orthopedics department indicated that Dr. Durrani received $60,000 in grants, contracts, or industry agreements from Medtronic Sofamor Danek in FY 2008.

237.    Financial information discovered concerning Dr. Durrani's relationship with Medtronic was found in Dr. Durrani's biography on the website for the Orthopaedic & Spine Institute, which Dr. Durrani currently operates in Pakistan. The biography states that "Dr. Atiq Dr. Durrani has also received the Clinical Spine Fellowship Grant by the Department of Orthopaedic Surgery which was funded by Medtronic Sofamor Danek with a budget of $59,170 per year." See http://www.osi.com.pk/doctor/dr-atiq-Dr. Durrani-md/.

238. When a request was made to Medtronic regarding its affiliation with Dr. Durrani, the Medtronic Supplier Relations Team stated that Dr. Durrani's "name [is] not listed in our system."

239. Medtronic further responded to the Deters Law Firm's request that the firm would need a "Vendor I.D. Number," which neither Medtronic nor any other party has provided.

240. David Rattigan, was Dr. Durrani's main Medtronic representative from Bahler Medical.

241. David Rattigan and Medtronic have the same lawyer. Despite the Deters Law Firm's willingness to cooperate in scheduling the date for a deposition, they have refused until recently. Mr. Rattigan's deposition was taken June 5, 2015.

242. In summary, clients of the Deters Law Firm, with the full knowledge and intentional consent of all Defendants, became unsuspecting experiments for real world testing of Medtronic hardware and BMP-2, by and through Dr. Durrani and CAST, who had secret financial connections to Medtronic, improper motives, and submitted false claims. The government paid for many of these improper and unregulated experiments as a result of the false claims made by Dr. Durrani, with the knowledge of Medtronic, under the veil of "medically necessary" surgeries.

243. Despite repeated requests, Medtronic has refused to cooperate in providing any requested information and is actively downplaying their connections to Dr. Durrani.

## X. THE DEFENDANTS AND BMP-2

244. The purpose of the background information on the following Defendants and BMP-2 concerning other hospitals is to show the egregious methods, which upon information and belief were used at all hospitals.

245.     The Defendants allowed and encouraged these practices by Dr. Durrani for the sole purpose of money and greed.

246.     David Rattigan was always present in Dr. Durrani's operating rooms as a representative of Medtronic.

247.     David Rattigan's sole job was to deliver the BMP-2/Infuse to the Hospitals and make sure that it was inserted correctly into the patient.

248.     David Rattigan's presence in the OR further supports the Defendants awareness of Dr. Durrani's fraudulent use of BMP-2/Infuse.

**249.     Informed Consent for Surgical or Medical Procedure and Sedation:**

It is the responsibly of the attending physician to obtain informed consent prior to the procedure. The patient, or his/her representative, will be advised by his/her physician of:

        a.      The explanation of the procedure

        b.      The benefits of the procedure

        c.      The potential problems that might occur during recuperation

        d.      The risks and side effects of the procedure which could include but are not limited to severe blood loss, infection, stroke or death.

        e.      The benefits, risks and side effect of alternative procedures including the consequences of declining this procedure or any alternative procedures.

        f.      The likelihood of achieving satisfactory results

Completion of the "Consent to Hospital and Medical Treatment" form to examine and treat is NOT sufficient as consent to perform a surgical procedure, invasive procedure, or for medical regimens of substantial risk or that are the subject of human investigation or research.

250.     The Defendants had the responsibility to carry out these consent rules.

251.     Dr. Durrani oftentimes used BMP-2 "off-label" when performing surgeries.

252.     BMP-2 is manufactured, marketed, sold and distributed by Defendant Medtronic under the trade name "Infuse."

253. Dr. Durrani is a consultant for Medtronic.

254. Defendants did not inform Plaintiffs of Durrani's financial interest, conflicts of interest or consulting arrangement with Medtronic.

255. Medtronic, provided in writing to Dr. Durrani the approved uses for BMP-2, the substance also referred to as Infuse, which is a bone morphogenic protein, used as an artificial substitute for bone grafting in spine surgeries.

256. BMP-2 is not approved by the Food and Drug Administration for use in the cervical and thoracic spine.

257. BMP-2 is neither safe nor approved for use on children less than twenty one (21) years of age.

258. For use in spinal surgery, BMP-2/Infuse is approved by the FDA for a limited procedure, performed on a limited area of the spine, using specific components. Specifically, the FDA approved Infuse for one procedure of the spine: Anterior Lumbar Interbody Fusion ("ALIF" or "Anterior" approach); and only in one area of the spine: L4 to S1; and only when used in conjunction with FDA-Approved Components: LT-CAGE Lumbar Tapered Fusion Device Component ("LT-CAGE")

259. Use of Infuse in cervical or thoracic surgery, or use through the back (posterior), or side (lateral), or on areas of the spine outside of the L4-S1 region (e.g., the cervical spine), or using components other than or in addition to the LT-CAGE is not approved by the FDA, and thus such procedures and/or use of non-FDA approved componentry is termed "off-label."

260. When used off-label, Infuse frequently causes excessive or uncontrolled (also referred to as "ectopic" or "exuberant") bone growth on or around the spinal cord. When

nerves are compressed by such excessive bone growth, a patient can experience, among other adverse events, intractable pain, paralysis, spasms, and cramps in limbs.

261. The product packaging for BMP-2/Infuse indicates it causes an increased risk of cancer four (4) times greater than other bone graft alternatives.

262. Dr. Durrani and Children's Hospital personnel did not disclose to Plaintiffs their intent to use BMP-2/Infuse, and further, did not disclose their intent to use BMP-2/Infuse in a way not approved by the FDA.

263. Dr. Durrani used BMP-2 in Plaintiff in a manner not approved by Medtronic or the FDA.

264. Defendants did not inform Plaintiffs that Dr. Durrani used Infuse/BMP-2 in his surgeries.

265. Plaintiffs would not have allowed BMP-2 to be used by Dr. Durrani in his surgery in a manner that was not approved by the FDA or Medtronic, Infuse/BMP-2's manufacturer.

266. Plaintiffs would not have consented to the use of BMP-2 in Plaintiff's body if informed of the risks by Dr. Durrani or any Children's Hospital personnel.

267. The written informed consent of Dr. Durrani signed by Plaintiffs lacked the disclosure of Infuse/BMP-2's use in his procedures.

268. Plaintiffs never received a verbal disclosure of Infuse/BMP-2 from Dr. Durrani or any Children's Hospital personnel.

269. Medtronic specifically required Infuse/BMP-2 only be used in "skeletally mature patients" with degenerative disc disease.

270. Medtronic required at least six (6) months of non-operative treatment prior to use of Infuse/BMP-2.

271. Dr. Durrani regularly used Infuse/BMP-2 without this six (6) month non-operative treatment.

272. Medtronic required BMP-2 always be used in conjunction with a metal LT cage.

273. Dr. Durrani regularly used BMP-2 without a proper LT cage in his surgeries.

### INFUSE/BMP-2

274. Dr. Durrani oftentimes used BMP-2 "off-label" when performing surgeries.

275. BMP-2 is manufactured, marketed, sold and distributed by Defendant Medtronic under the trade name "Infuse."

276. Dr. Durrani is a consultant for Medtronic.

277. Defendants did not inform Plaintiff of Durrani's financial interest, conflicts of interest or consulting arrangement with Medtronic.

278. Medtronic, provided in writing to Dr. Durrani and CAST the approved uses for BMP-2, the substance also referred to as Infuse, which is a bone morphogenic protein, used as an artificial substitute for bone grafting in spine surgeries.

279. BMP-2 is not approved by the Food and Drug Administration for use in the cervical and thoracic spine.

280. BMP-2 is neither safe nor approved for use on children less than twenty one (21) years of age.

281. For use in spinal surgery, BMP-2/Infuse is approved by the FDA for a limited procedure, performed on a limited area of the spine, using specific components. Specifically, the FDA approved Infuse for one procedure of the spine: Anterior Lumbar

Interbody Fusion ("ALIF" or "Anterior" approach); and only in one area of the spine: L4 to S1; and only when used in conjunction with FDA-Approved Components: LT-CAGE Lumbar Tapered Fusion Device Component ("LT-CAGE")

282.    Use of Infuse in cervical or thoracic surgery, or use through the back (posterior), or side (lateral), or on areas of the spine outside of the L4-S1 region (e.g., the cervical spine), or using components other than or in addition to the LT-CAGE is not approved by the FDA, and thus such procedures and/or use of non-FDA approved componentry is termed "off-label."

283.    When used off-label, Infuse frequently causes excessive or uncontrolled (also referred to as "ectopic" or "exuberant") bone growth on or around the spinal cord. When nerves are compressed by such excessive bone growth, a patient can experience, among other adverse events, intractable pain, paralysis, spasms, and cramps in limbs.

284.    The product packaging for BMP-2/Infuse indicates it causes an increased risk of cancer four (4) times greater than other bone graft alternatives.

285.    Dr. Durrani, CAST staff and employees, Journey Lite personnel, and West Chester/UC Health personnel did not disclose to Plaintiff their intent to use BMP-2/Infuse, and further, did not disclose their intent to use BMP-2/Infuse in a way not approved by the FDA.

286.    Dr. Durrani used BMP-2 in Plaintiff in a manner not approved by Medtronic or the FDA.

287.    Plaintiff was not informed by Defendants that Dr. Durrani used Infuse/BMP-2 in her surgeries.

288.   Plaintiff would not have allowed BMP-2 to be used by Dr. Durrani in her surgeries in a manner that was not approved by the FDA or Medtronic, Infuse/BMP-2's manufacturer.

289.   Plaintiff would not have consented to the use of BMP-2 in her body if informed of the risks by Dr. Durrani, CAST staff and employees, Journey Lite personnel, or any West Chester/UC Health personnel.

290.   The written informed consent of Dr. Durrani and CAST signed by Plaintiff lacked the disclosure of Infuse/BMP-2's use in her procedures.

291.   Plaintiff never received a verbal disclosure of Infuse/BMP-2 from Dr. Durrani, CAST staff and employees, Journey Lite personnel, or any West Chester/UC Health personnel.

292.   Medtronic specifically required Infuse/BMP-2 only be used in "skeletally mature patients" with degenerative disc disease.

293.   Medtronic required at least six (6) months of non-operative treatment prior to use of Infuse/BMP-2.

294.   Dr. Durrani regularly used Infuse/BMP-2 without this six (6) month non-operative treatment.

295.   Medtronic required BMP-2 always be used in conjunction with a metal LT cage.

296.   Dr. Durrani regularly used BMP-2 without a proper LT cage in his surgeries.

## PUREGEN

### PUREGEN BACKGROUND

291.    PureGen Osteoprogenitor Cell Allograft (PureGen) is a highly concentrated, pure population of Early Lineage Adult (ELA) stem cells that originates in bone marrow and is collected from live, healthy donors.

292.    PureGen is harvested from living human beings under the Stem Cell Collection Program administered by the Food and Drug Administration (FDA) and is defined as both a "biologic" by 42 U.S.C. 351(i) and a "drug" as defined by U.S.C. 321(g).

293.    PureGen's purpose was to facilitate bone fusion by mimicking the regenerative environment of youthful tissues by increasing the concentration of stem cells available to repair tissue and build bone.

294.    When used off-label, as Dr. Durrani often did, biologic bone allograft frequently causes excessive or uncontrolled (also referred to as "ectopic" or "exuberant") bone growth on or around the spinal cord.

295.    When nerves are compressed by such excessive bone growth, a patient can experience, among other adverse events, intractable pain, paralysis, spasms, and cramps in limbs.

296.    Alphatec Spine, Inc. is a corporation under the laws of California, and jointly developed and distributed PureGen in the State of Ohio.

297.    Alphatec Holdings, Inc. is a holding corporation formed under the laws of Delaware with no operations separate from the holding of other companies which owns Alphatec Spine, Inc.

298.    Dirk Kuyper was President and CEO of Alphatec Holdings, Inc. from February 2007 to August 2012.

299.    Parcell Laboratories, LLC is organized under the laws of Delaware and jointly developed Puregen.

300.    Alphatec and Parcell co-developed the product "PureGen", and both expected PureGen would be initially limited in application.

301.    PureGen is produced and distributed by Alphatec Spine, LLC, a division of Alphatec Holdings.

302.    PureGen was entered into 3 clinical trials by Alphatec on or around February 9, 2011 which were scheduled to last until September of 2013.

303.    The study population were 50 male/female subjects 18 years and older suffering from symptoms of cervical degenerative disc disease in one to four contiguous levels between C3 and T1.

304.    The clinical trial required:

    a.    Inclusion

        i.    Age over 50

        ii.    Side-by-side use of Puregen and Autologous bone in the same patient for radiographic comparison

        iii.    Symptomatic lumbar degenerative disc disease in up to 2 contiguous levels between L1 and S1

        iv.    Subjects with back and/or leg paint indicated for posterior stabilization with or without decompression at any level and posteriolateral fusion

49

        v.      Unresponsive to conservative treatment for at least 6 months

        vi.      Radiographic evidence of primary diagnosis

b.    Exclusion:

        vii.      No healthy volunteers permitted

        viii.      More than two levels requiring posteriolateral fusion (PLF)

        ix.      Spondyliosis greater than Grade 1

        x.      Prior failed fusion surgery at lumbar level(s)

        xi.      Systemic or local infection in the disc or cervical spine, past or present

        xii.      Active systemic disease

        xiii.      Osteoporosis, Osteomalacia, or other metabolic bone disease that would significantly inhibit bone healing

        xiv.      Use of other bone graft, Bone Morphogenic Protein (BMP), or bone graft substitutes in addition to or in place of those products specified

        xv.      BMI greater than 40

        xvi.      Use of post-operative spinal cord stimulator

        xvii.      Known or suspected history of alcohol and/or drug abuse

        xviii.      Involved in pending litigation or worker's compensation related to the spine

        xix.      Pregnant or planning to become pregnant during the course of the study

        xx.      Insulin-dependent diabetes mellitus

        xxi.      Life expectancy less than duration of study

xxii.    Any significant psychological disturbance that could

impair consent process or ability to complete self-

assessment questionnaires

xxiii.    Undergoing chemotherapy or radiation treatment, or

chronic use of oral or injected steroids or prolonged use

of non-steroidal anti-inflammatory drugs

xxiv.    Known history of hypersensitivity or anaphylactic

reaction to dimenthyl sulfoxide (DMSO).

305.    All 3 clinical trials were "Terminated" before any results were produced.

306.    Alphatec and Parcell saw this limited approval for clinical trials as an opportunity

to market PureGen without premarket approval, 510K clearance, an exception to the

Food Drug and Cosmetic Act, meeting the humanitarian device exception, investigational

new drug (IND) application, or other permission to market PureGen, all in violation of

the Food Drug and Cosmetic Act.

307.    Alphatec and Parcell began a course of conduct designed to expand the

application of PureGen by end users in excess of the approved clinical trial of PureGen.

This course of conduct utilized fraud, false statements, material misrepresentation, and

deceit in order to broaden the sales of PureGen beyond that which the usual acceptance

within the scientific community or regulatory approval would otherwise allow.

308.    The Food and Drug Administration (FDA) conducted an inspection of Parcell

Laboratories between February 9-14, 2011.

309.    After the inspection, the FDA responded quickly to the unlicensed marketing of

the device PureGen by warning that PureGen was not the subject of an IND application

nor a valid biologics license with a letter dated June 23, 2011.

310.    The letter stated that the cells used in the production of PureGen were human cells, tissues, or cellular and tissue-based products (HCT/Ps) as defined in 21 CFR 1271.3(d).

311.    Based on this analysis, the FDA determined that PureGen was a drug and biological product as defined in the Federal Food, Drug and Cosmetic Act.

312.    According to the Public Health Service Act, a valid biologics license is also required to introduce a biologics device to the market.

313.    Alphatec Spine did not acquire a valid biologics license to enter a biologics product into interstate commerce, in violation of 21 U.S.C. 355(a); 42 U.S.C. 262(a).

314.    The FDA stated that PureGen, "does not meet all of the criteria in 21 CFR 1271.10(a) and therefore is not regulated solely under section 361 of the Public Health Service Act and the regulations in 21 CFR Part 1271. Specifically, the product does not meet the criterion in 21 CFR 1271.10(a)(4)(ii)(b) because the product is dependent on the metabolic activity of living cells for its primary function."

315.    As a result, a valid biologics license was required, which was never obtained by Alphatec or Parcell labs in regards to PureGen. Defendants knew all this.

316.    Given this lack of a valid biologics license, the FDA determined that the marketing of PureGen violated both the Federal Food, Drug and Cosmetic Act and the Public Health Service Act.

317.    In a statement to the press approximately a week after receiving the FDA Letter, Alphatec President Dirk Kuyper stated, "Both Alphatec Spine and Parcell Laboratories are fully committed to work closely and collaboratively with the FDA to address the questions related to the PureGen Product. We look forward to discussing the PureGen

52

product with the FDA and sharing our clinical outcomes to date." See article "Alphatec comments on FDA's letter regarding PureGen product for spinal fusion procedures", Spinal News International, July 28, 2011, attached as Exhibit E.

318.    No such cooperation by Alphatec and Parcell labs occurred and no clinical outcomes were shared with the FDA as all clinical trials of PureGen were "Terminated" and no data was released as to the findings.

319.    In fact, Alphatec and Parcell responded to this letter by continuing to market PureGen in an unlicensed manner until Alphatec finally acknowledged the letter in or around February 2013, almost two years after receiving the letter, by stating it disagrees with the FDA's classification of PureGen as anything other than a tissue product – despite the clinical trial approval listing PureGen as "Biological: PureGen Osteoprogenitor Cell Allograft".

320.    Furthermore, according to sales representative, Thomas Blank, Alphatec falsely informed distributors of PureGen that they "resolved" the issues addressed in the FDA letter, did not have to take PureGen off the market and it was "ok" for their distributors to continue marketing and selling PureGen.

321.    Despite the approval for the clinical trial of PureGen which limited enrollment to 50 patients, Alphatec advertised in its 2012 Annual Report that PureGen had been implanted in over 3,500 patients.

322.    PureGen further stated that it had been placed in these 3,500 patients with "no adverse events related to the product", despite no study, statistics or information to back up such a claim.

323.    This 2012 annual report also identified PureGen as a biologic.

324.    In the First Quarter of 2011, Alphatec Spine attributed part of its 40.9% increase

in revenue to the PureGen product. See Becker's Spine Review, <u>Alphatec Spine Reports</u>

<u>$49.7M in Q1 Revenue</u>, 40.9% Increase, May 5, 2011, attached as exhibit H.

325.    Eventually, after PureGen had been unlawfully implanted in thousands of

patients, Alphatec and Parcell conceded that PureGen is a tissue product and a biologic

and stopped shipping PureGen in February of 2013.

## PUREGEN AND OHIO LAW

326.    It is the position of the Deters Law Firm that the distribution and use of PureGen

by Dr. Durrani, Evolution Medical, Alphatec Spine, Inc., and West Chester/UC Health by

Defendants is in violation not only of Federal Law as outlined in the FDA's letter, but

Ohio State Law as well.

327.    Ohio Revised Code 3715.65(A) states that "No person shall sell, deliver, offer for

sale, hold for sale, or give away any new drug unless an application with respect to the

drug has become effective under section 505 of the Federal Food, Drug and Cosmetic

Act, 52 Stat. 1040 (1938), 21 U.S.C.A. 301". Defendants violated this provision.

328.    A "New Drug" is defined as "Any drug the composition of which is not generally

recognized among experts by scientific training and experience to evaluate the safety of

drugs, as safe for use under the conditions prescribed, recommended, or suggested in the

labeling thereof." Ohio Revised Code 3715.01(9)(a).

329.    PureGen's status as a Biologic further supports the classification of a drug under

the FDA and Ohio Law: "A "biological product" means a virus, therapeutic serum, toxin,

antitoxin, vaccine, blood, blood component or derivative, allergenic product, or

analogous product, or arsphenamine or derivative of arsphenamine (or any other trivalent

organic arsenic compound), applicable to the prevention, treatment, or cure of a disease or condition of human beings (Public Health Service Act Sec. 351(i)). Additional interpretation of the statutory language is found in 21 CFR 600.3. Biological products also meet the definition of either a drug or device under Sections 201(g) and (h) of the Federal Food, Drug, and Cosmetic Act (FD&C Act)." See http://www.fda.gov/ICECI/Inspections/IOM/ucm122535.htm.

330.    It is the position of the Deters Law Firm that PureGen is a drug as defined in ORC 3715.01 and that its distribution before FDA approval was in violation of ORC 3715.65(A). The Defendants with full knowledge and intent violated this statute.

## PUREGEN AT THE HOSPITALS

331.    On October 10, 2011, UC Health began purchasing PureGen from Alphatec. Thomas Blank was an employee of Innovative Medical Consultants, LLC and a sales representative, seller, marketer, and distributer of PureGen for the Northern Kentucky/Cincinnati area.

332.    In his professional capacity, Thomas Blank was present during most, if not all, of the surgeries at issue where PureGen was secretly implanted into various Plaintiffs without informed consent or permission.

333.    Thomas Blank worked directly with Alphatec Spine, Inc. and Defendants in the marketing and distribution of PureGen.

334.    Additionally, Thomas Blank is a shareholder in Alphatec Spine, Inc.

335.    On May 10, 2012 Evolution Medical, LLC, a physician owned distributorship (POD), owned in part (at least 40%) by Dr. Durrani and incorporated in Delaware, received a Kentucky Certificate of Authority.

336. Around this time, Thomas Blank began to work with Evolution Medical in the marketing and distribution of PureGen, in addition to his dealing with Alphatec Spine, Inc.

337. On July 20, 2012, UC Health with the full knowledge and consent of Defendants began purchasing PureGen from Evolution Medical, LLC.

338. The purchase of PureGen, the logistics of the billing, the bills of lading, the receiving and handling of PureGen for West Chester Hospital was handled by UC Health Purchasing.

339. The Defendants tracked West Chester/UC Health's purchases of PureGen from Evolution medical.

340. Specifically, Thomas Blank would provide the materials from Alphatec related to the use and approval of PureGen to Dwayne Brown on behalf of UC Health, who would request PureGen based on the amounts requested by Dr. Durrani and other doctors who used the product.

341. After the UC Health reps approved the use of PureGen, Thomas Blank and his associate Toby Wilcox would order the product, typically in bulk, and draft the requisite billing documents.

342. The PureGen ordered would be stored on site at WCH in the freezer of the operating rooms.

343. In addition to Dr. Durrani, other doctors at WCH used PureGen, including Dr. Chunduri, Dr. Curt and Dr. Shanti.

344. Defendants would purchase and allow these doctors to use a substance not approved by the FDA in patients without their informed consent.

56

345.    Though WCH and UC Health do have patients fill out "informed consent" forms, no mention of PureGen or its non-FDA approved status is mentioned on these forms.

## DR. DURRANI AND PUREGEN

346.    In one of the few depositions taken of Dr. Durrani before his flight from the country he stated that PureGen is "essentially stem cells" and that he "used to use [PureGen] for a certain amount of time." Deposition of Dr. Durrani in *Brenda Shell v. Durrani*, p. 25-26, attached as Exhibit N.

347.    This "certain amount of time" was approximately 3 years between 2010 and 2013, all while PureGen remained unapproved by the FDA.

348.    Though downplaying his involvement with PureGen, Dr. Durrani, through his illegal POD Evolution Medical, distributed PureGen to West Chester/UC Health with the full knowledge and consent of Defendants.

349.    Dr. Durrani and his Evolution Medical co-owner Toby Wilcox and Defendants, knew the Department of Health and Human Services and the United States Senate Finance Committee has released reports on dangers of Physician-owned entities, notably Physician-owned Distributorships (POD's).

350.    Dr. Durrani and Toby Wilcox's actions through Evolution Medical violated the Anti-Kickback Statute 42 U.S.C. 1320 and Stark Law 42 U.S.C. 1395.

351.    Compliance with the Anti-Kickback Statutes is a condition of receiving payment from a Federally-funded healthcare program, and most private insurers have a parallel conditional requirement.

352.    The Anti-Kickback Statute prohibits the payment and receipt of kickbacks in return for either procuring or recommending the procurement of a good, facility, or item to be paid in whole or in part by a federal healthcare program. 42 U.S.C. 1320a-7b(b).

353.    In violation of 45 C.F.R. 46, and in furtherance of the scheme to feign avoidance of the anti-kickback statutes, Dr. Durrani, CAST, Alphatec and the Defendants experimented on patients by using PureGen in unapproved manners, without the informed consent of the patients, and subsequently billing their health insurance companies all while concealing the true nature of their actions.

354.    Dr. Durrani also had connections with Alphatec as his personal calendar indicates meetings with Dirk Kuyper, President and CEO of Alphatec in 2008.

355.    Dr. Durrani experimentally used Puregen bone graft in twenty cervical surgeries, along with as many as 72 thoracic, cervical, and lumbar surgeries, ignoring the limited uses it was approved for in the clinical trials.

356.    Dr. Durrani, through his POD Evolution Medical, was essentially "double dipping" in his dealings with PureGen.

357.    Dr. Durrani would sell WCH and the other hospitals the PureGen through Evolution Medical and then use and bill for the PureGen in his surgeries.

358.    Dr. Durrani and Defendants knew such an arrangement was either unethical and illegal (though still not disclosing the use of PureGen) by having the patients sign an Acknowledgement of Potential Conflict of Interest form.

359.    WCH and Defendant also benefited from this arrangement by up charging patients for the PureGen after purchasing it from Evolution Medical and Dr. Durrani.

360.   At all times relevant, Dr. Durrani and Defendants was in exclusive control of the amount and ratio of Puregen bone graft that was experimentally implanted into patients.

361.   PureGen was and remains unapproved by the FDA for use in humans without an Investigation New Drug ("IND") or experimental informed consent of the patient.

362.   Dr. Durrani and Defendants did not receive experimental informed consent from patients, nor did he verify that an IND was obtained.

363.   The basic "Informed Consent Forms" Dr. Durrani and CAST did have patients fill out made no mention of PureGen or the fact a non-FDA approved product was being implanted in their body.

364.   In fact, Dr. Durrani and Defendants would even conceal the use of PureGen by intentionally withholding it from the billing records, noting on one Pre-Op Code sheet "Do Not Bill" twice in regards to PureGen.

365.   Implanting Puregen in any part of the spinal canal without FDA clearance, proper trials, and patient consent is reckless battery and violates the Hippocratic Oath's statement "I will prescribe regimens for the good of my patients according to my ability and my judgment and never **do harm** to anyone." It is criminal.

## PUREGEN AND OUR CLIENTS

366.   What follows are just a few examples of the damage caused Dr. Durrani and the Defendants deceptive and fraudulent use of PureGen in Deters Law Office clients without their consent.

367.   A majority of these surgeries occurred AFTER the FDA inspection and subsequent warning on the non-FDA approved status of PureGen.

368.    Following the cervical surgeries in which Puregen was implanted, the patients' pain became far worse and more extreme.

369.    The patients attest to difficulty with swallowing unthickened liquid, medications in pill form, routine saliva, and food.

370.    Many patients describe a choking sensation felt on a daily basis when swallowing and changes to the tone and audibility of their voice, along with a chronic cough.

371.    Following the thoracic and lumbar surgeries, patients attest to increased spinal pain, difficulty with ambulation, numbness and tingling in lower extremities, decreased flexibility.

372.    Below are some of the clients experiences since having the Puregen implanted:

373.    "I have severe low back pain, stiffness, decreased range of motion and tenderness. Pain radiating to left posterior thigh and right/left lumbar area.  Onset months ago after surgery." – William Hayes

374.    "Constant, irritating pain, less intense but still present. Even after two surgeries, I continue to have limited use of my left leg. The pain is ever-present. I am easily fatigued and have severe pain after brief tasks such as cooking dinner, preaching a sermon, even making a bed. Bending over is so painful and produces such instability that my family helps put on my socks and shoes.   I require a cane for ambulation, due to left leg weakness and limited range of motion." – Darrell Earls

375.    "Severe spin in my neck, arm, shoulder blades.  Pressure on my throat making it unbearable to swallow meds and food. Loss of range of motion in my neck and stiffness in back.  The pain is so severe that I can no longer sleep laying down.  I have to sleep

sitting up. The pain in my neck is unbearable most days. The pain runs between my shoulder blades into my chest and in my throat and side of my neck." - Duane Pelfrey

376. "I feel I have lost a lot of the flexibility in my neck and back. I have lower back pain, tightness in neck and shoulders, and have a hard time lifting/standing for long periods of time. When I bend over, I have a hard time straightening back up to an upright position." - Dana Conley

377. "Low back pain radiating into bilateral hips, buttocks, legs and feet. Bilateral leg weakness. Numbness in left foot and toes. Bilateral buttock and posterior thigh muscle spasms. Burning sensation in right abdomen that radiates around to back. My post-surgery MRI and CT scan showed bony overgrowth into the foramen and into the canal on left at L5-S1." - Julie Martin

378. "I experience pounding headaches that are far worse than anything prior to surgery. Left leg is numb, painful and swollen, muscle spasms occurring in hip and bilateral legs since surgeries with Dr. Durrani. My whole back, neck and leg hurt so bad I could throw up." - Tonia McQueary

379. "I have much more pain. Constant right-sided headache, intensity varies but always present. The back of my neck swells. My esophagus feels like it is in a different place. My throat swells." – Kelly Hennessey

380. As stated, there are just a few examples of clients that have been discovered to have had non-FDA approved PureGen implanted into their bodies without their informed consent, in violation of both Federal and State Law, all with the knowledge of Defendants.

## PUREGEN

381. Dr. Durrani oftentimes used Puregen when performing surgeries.

382. Puregen is a product produced by Alphatec Spine.

383. Dr. Durrani was and is a paid consultant for Alphatec Spine.

384. Dr. Durrani has an ownership stake in the Alphatec Spine.

385. Puregen has never been approved by the FDA for any human use.

386. Puregen is now removed from the market for any use.

387. Dr. Durrani used the product Puregen as bone graft substitute similar to Infuse/BMP-2 during spinal surgeries.

388. Dr. Durrani, CAST staff and employees, Journey Lite personnel, and West Chester/UC Health personnel did not disclose their intent to use Puregen, nor did they inform Plaintiff that it was a product that was not approved by the FDA for human use.

389. Dr. Durrani used Puregen in Plaintiff in manners not approved by the FDA.

390. Plaintiff was not informed by Dr. Durrani, CAST staff and employees, Journey Lite personnel, or any West Chester/UC Health personnel that Dr. Durrani used Puregen in her surgeries.

391. Plaintiff would not have allowed Puregen to be used by Dr. Durrani in her surgeries in a manner that was not approved by the FDA.

392. Plaintiff would not have consented to the use of Puregen in her body if informed of the risks by Dr. Durrani, CAST staff and employees, Journey Lite personnel, or any West Chester/UC Health personnel.

393. The written informed consent of Dr. Durrani and CAST signed by Plaintiff lacked the disclosure of Puregen's use in her procedures.

394.    Plaintiff never received a verbal disclosure of Puregen from Dr. Durrani, CAST staff and employees, Journey Lite personnel, or any West Chester/UC Health personnel.

### DR. DURRANI COUNTS:

### COUNT I: NEGLIGENCE

395.    Defendant Dr. Durrani owed his patient, Plaintiff, the duty to exercise the degree of skill, care, and diligence an ordinarily prudent health care provider would have exercised under like or similar circumstances.

396.    Defendant Dr. Durrani breached his duty by failing to exercise the requisite degree of skill, care and diligence that an ordinarily prudent health care provider would have exercised under same or similar circumstances through, among other things, negligent diagnosis, medical mismanagement and mistreatment of Plaintiff, including but not limited to improper selection for surgery, improper performance of the surgery, and improper follow-up care addressing a patient's concerns.

397.    As a direct and proximate result of the aforementioned negligence and deviation from the standard of care on the part of the Defendant Dr. Durrani, Plaintiff sustained all damages requested in the Prayer for Relief.

### COUNT II: BATTERY

398.    Dr. Durrani committed battery against Plaintiff by performing a surgery that was unnecessary, contraindicated for Plaintiff's medical condition, and for which he did not properly obtain informed consent, inter alia, by using BMP-2, PureGen and/or Baxano in ways and for surgeries not approved by the FDA and medical community, and by the failure to provide this information to Plaintiff.

63

399. Plaintiff would not have agreed to the surgeries if they knew the surgeries was/were unnecessary, not approved by the FDA, and not indicated.

400. As a direct and proximate result of the aforementioned battery by Dr. Durrani, Plaintiff sustained all damages requested in the Prayer for Relief.

## COUNT III: LACK OF INFORMED CONSENT

401. The informed consent forms from Dr. Durrani and CAST which they required Plaintiff to sign failed to fully cover all the information necessary and required for the procedures and surgical procedures performed by Dr. Durrani. Dr. Durrani and CAST each required an informed consent release.

402. In addition, no one verbally informed Plaintiff of the information and risks required for informed consent at the time of or before Plaintiff's surgery.

403. Dr. Durrani failed to inform Plaintiff of material risks and dangers inherent or potentially involved with her surgeries and procedures.

404. Had Plaintiff been appropriately informed of the need or lack of need for surgery and other procedures and the risks of the procedures, Plaintiff would not have undergone the surgery or procedures.

405. As a direct and proximate result of the lack of informed consent, Plaintiff sustained all damages requested in the Prayer for Relief.

## COUNT IV: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

406. Dr. Durrani's conduct as described above was intentional and reckless.

407. It is outrageous and offends against the generally accepted standards of morality.

408. It was the proximate and actual cause of Plaintiff's psychological injuries, emotional injuries, mental anguish, suffering, and distress.

409.    Plaintiff suffered severe distress and anguish so serious and of a nature that no reasonable man or woman would be expected to endure.

## COUNT V: FRAUD

410.    Dr. Durrani made material, false representations to Plaintiff and their insurance company related to Plaintiff's treatment including: stating the surgeries were necessary, that Dr. Durrani "could fix" Plaintiff, that more conservative treatment was unnecessary and futile, that the surgery would be simple or was "no big deal", that Plaintiff would be walking normally within days after each surgery, that the procedures were medically necessary and accurately reported on the billing to the insurance company, that the surgery was successful, and that Plaintiff was medically stable and ready to be discharged.

411.    Dr. Durrani also concealed the potential use of Infuse/BMP-2 and/or Puregen in Plaintiff's surgery, as well as other information, when he had a duty to disclose to Plaintiff his planned use of the same.

412.    These misrepresentations and/or concealments were material to Plaintiff because they directly induced Plaintiff to undergo her surgery.

413.    Dr. Durrani knew or should have known such representations were false, and/or made the misrepresentations with utter disregard and recklessness as to their truth that knowledge of their falsity may be inferred.

414.    Dr. Durrani made the misrepresentations before, during and after the surgeries with the intent of misleading Plaintiff and their insurance company into relying upon them. Specifically, the misrepresentations were made to induce payment by the insurance company, without which Dr. Durrani would not have performed the surgeries, and to

induce Plaintiff to undergo the surgeries without regard to medical necessity and only for the purpose of receiving payment.

415.    The misrepresentations and/or concealments were made during Plaintiff's office visits at Dr. Durrani's CAST offices.

416.    Plaintiff was justified in their reliance on the misrepresentations because a patient has a right to trust their doctor and that the facility is overseeing the doctor to ensure the patients of that doctor can trust the facility.

417.    As a direct and proximate result of the aforementioned fraud, Plaintiff did undergo surgeries which were paid for in whole or in part by their insurance company, and suffered all damages as requested in the Prayer for Relief.

## COUNT VI: SPOLIATION OF EVIDENCE

418.    Dr. Durrani willfully altered, destroyed, delayed, hid, modified and/or spoiled ("spoiled") Plaintiff's records, emails, billing records, paperwork and related evidence.

419.    Dr. Durrani spoiled evidence with knowledge that there was pending or probable litigation involving Plaintiff.

420.    Dr. Durrani's conduct was designed to disrupt Plaintiff's potential and/or actual case, and did in fact and proximately cause disruption, damages and harm to Plaintiff.

## COUNT VII: LOSS OF CONSORTIUM

421.    At all times relevant, the Plaintiffs were married.

422.    As a result of the wrongful acts and omissions of Dr. Durrani, Plaintiffs were caused to suffer, and will continue to suffer in the future, loss of consortium, loss of society, loss of affection, loss of assistance, and loss of conjugal fellowship, all to the detriment of Plaintiffs' marital relationship.

423.    All the aforesaid injuries and damages were caused proximately by the acts and omissions of Dr. Durrani.

## CAST COUNTS:

## COUNT I: VICARIOUS LIABILITY

424.    At all times relevant, Defendant Dr. Durrani was an agent, and/or employee of CAST.

425.    Dr. Durrani is in fact, the owner of CAST.

426.    Defendant Dr. Durrani was performing within the scope of his employment with CAST during the care and treatment of Plaintiff.

427.    Defendant CAST is responsible for harm caused by acts of its employees for conduct that was within the scope of employment under the theory of respondeat superior.

428.    Defendant CAST is vicariously liable for the acts of Defendant Dr. Durrani alleged in this Complaint including all of the counts asserted against Dr. Durrani directly.

429.    As a direct and proximate result of Defendant CAST's acts and omissions, Plaintiff sustained all damages requested in the Prayer for Relief.

## COUNT II: NEGLIGENT HIRING, RETENTION, AND SUPERVISION

430.    CAST provided Dr. Durrani, inter alia, financial support, control, medical facilities, billing and insurance payment support, staff support, medicines, and tangible items for use on patients.

431.    CAST and Dr. Durrani participated in experiments using BMP-2 and/or Puregen bone graft on patients, including Plaintiff, without obtaining proper informed consent thereby causing harm to Plaintiff.

432.    CAST breached its duty to Plaintiff, inter alia, by not supervising or controlling the actions of Dr. Durrani and the doctors, nurses, staff, and those with privileges, during the medical treatment of Plaintiff at CAST.

433.    The Safe Medical Device Act required entities such as CAST to report serious injuries, serious illnesses, and deaths related to failed medical devices to the FDA and the manufacturer; this was never done.

434.    Such disregard for and violations of federal law represents strong evidence that CAST negligently hired, retained, and supervised Dr. Durrani.

435.    As a direct and proximate result of the acts and omissions herein described, including but not limited to failure to properly supervise medical treatment by Dr. Durrani, Plaintiff sustained all damages requested in the Prayer for Relief.

## COUNT III: SPOLIATION OF EVIDENCE

436.    CAST, through its agents and employees, willfully altered, destroyed, delayed, hid, modified and/or spoiled ("spoiled") Plaintiff's records, emails, billing records, paperwork and related evidence.

437.    CAST, through its agents and employees, spoiled evidence with knowledge that there was pending or probable litigation involving Plaintiff.

438.     CAST's conduct was designed to disrupt Plaintiff's potential and/or actual case, and did in fact and proximately cause disruption, damages and harm to Plaintiff.

## COUNT IV: OHIO CONSUMER SALES PROTECTION ACT

439.     Although the Ohio Consumer Sales Protection statutes O.R.C 1345.01 et seq. exempts physicians, a transaction between a hospital and a patient/consumer is not clearly exempted.

440.     CAST's services rendered to Plaintiff constitute a "consumer transaction" as defined in ORC Section 1345.01(A).

441.     CAST omitted suppressed and concealed from Plaintiffs facts with the intent that Plaintiffs rely on these omissions, suppressions and concealments as set forth herein.

442.     CAST's misrepresentations, and its omissions, suppressions and concealments of fact, as described above, constituted unfair, deceptive and unconscionable acts and practices in violation of O.R.C 1345.02 and 1345.03 and to Substantive Rules and case law.

443.     CAST was fully aware of its actions.

444.     CAST was fully aware that Plaintiffs were induced by and relied upon CAST's representations at the time CAST was engaged by Plaintiffs.

445.     Had Plaintiffs been aware that CAST's representations as set forth above were untrue, Plaintiffs would not have used the services of Defendants.

446.     CAST, through its agency and employees knowingly committed the unfair, deceptive and/or unconscionable acts and practices described above.

447.    CAST's actions were not the result of any bona fide errors.

448.    As a result of CAST's unfair, deceptive and unconscionable acts and

practices, Plaintiffs have suffered and continues to suffer damages, which include,

but are not limited to the following:

a.    Loss of money paid

b.    Severe aggravation and inconveniences

c.    Under O.R.C. 1345.01 Plaintiffs are entitled to:

    i.    An order requiring that CAST restore to Plaintiffs all money received

    from Plaintiffs plus three times actual damages and/or actual/statutory

    damages for each violation;

    ii.    All incidental and consequential damages incurred by Plaintiffs;

    iii.    All reasonable attorneys' fees, witness fees, court costs and other fees

    incurred.

### COUNT V: FRAUD

449.    CAST sent out billing to Plaintiff's insurance company after the surgeries at

WCH, Christ Hospital, Journey Lite and Riverview.

450.    The exact dates these medical bills were sent out are reflected in those medical

bills.

451.    These bills constituted affirmative representations by CAST that the charges

related to Plaintiff's surgeries were medically appropriate and properly documented.

452.    The bills were sent with the knowledge of CAST that in fact Plaintiff's surgeries

were not appropriately billed and documented and that the services rendered at West

Chester Hospital Christ Hospital, Journey Lite and Riverview Hospital associated with

Dr. Shanti and Dr. Durrani were not appropriate.

453. The bills sent by CAST to Plaintiff falsely represented that Plaintiff's surgeries were appropriately indicated, performed and medically necessary in contra-indication of the standard of care.

454. Plaintiff relied on the facility holding Dr. Shanit and Dr. Durrani out as a surgeon and allowing him to perform surgeries at its health care facility as assurance the facility was overseeing Dr. Durrani, vouching for his surgical abilities, and further was appropriately billing Plaintiff for CAST's services in association with Dr. Durrani's surgery.

455. As a direct and proximate result of this reliance on the billing of CAST, Plaintiff incurred medical bills that she otherwise would not have incurred.

456. CAST also either concealed from Plaintiff that they knew about Dr. Durrani and Dr. Shanti misrepresenting to Plaintiff the nature of the surgeries, and the particular risks that were involved therein.

457. CAST's concealments and misrepresentations regarding Infuse/BMP-2 and/or Puregen and the nature and risks of Plaintiff's surgeries were material facts.

458. Because of its superior position and professional role as a medical service provider, CAST had a duty to disclose these material facts to Plaintiff and a duty to refrain from misrepresenting such material facts to Plaintiff.

459. CAST intentionally concealed and/or misrepresented said material facts with the intent to defraud Plaintiff in order to induce Plaintiff to undergo the surgeries, and thereby profited from the surgeries and procedures Dr. Shanti and Dr. Durrani performed on Plaintiff at WCH, Christ Hospital, Journey Lite, and Riverview Hospital.

460.    Plaintiff is still awaiting itemized billing from CAST reflecting the exact totals charged for Plaintiff's surgery.

461.    Had Plaintiff known before Plaintiff's surgeries that Infuse/BMP-2 and/or Puregen would be used in Plaintiff's spine and informed of the specific, harmful risks flowing therefrom, Plaintiff would not have undergone the surgery with Dr. Durrani at West Chester Hospital, Christ Hospital, Journey Lite, and Riverview Hospital.

462.    Upon information and belief, Plaintiff believes the bills requested by Plaintiff will indicate that CAST falsely represented that Plaintiff's surgery was appropriately indicated, performed, and medically necessary in contra-indication of the standard of care.

463.    Plaintiff is still awaiting itemized billing from CAST reflecting the exact totals charged for Plaintiff's surgery.

464.    As a direct and proximate result of the fraud against plaintiff by CAST, Plaintiff sustained all damages requested in the prayer for relief.

## COUNT V: LOSS OF CONSORTIUM

465.    At all times relevant, the Plaintiffs were married.

466.    As a result of the wrongful acts and omissions of CAST, Plaintiffs were caused to suffer, and will continue to suffer in the future, loss of consortium, loss of society, loss of affection, loss of assistance, and loss of conjugal fellowship, all to the detriment of Plaintiffs' marital relationship.

467.    All the aforesaid injuries and damages were caused proximately by the acts and omissions of CAST.

## WEST CHESTER HOSPITAL/UC HEALTH COUNTS:

### COUNT I: NEGLIGENCE

468.    West Chester Hospital/UC Health owed their patient, Plaintiff, through its agents and employees the duty to exercise the degree of skill, care, and diligence an ordinarily prudent health care provider would have exercised under like or similar circumstances.

469.    West Chester Hospital/UC Health acting through its agents and employees breached their duty by failing to exercise the requisite degree of skill, care and diligence that an ordinarily prudent health care provider would have exercised under same or similar circumstances through, among other things, negligent diagnosis, medical mismanagement and mistreatment of Plaintiff, including but not limited to improper selection for surgery, improper performance of the surgery, improper assistance during Plaintiff's surgeries and improper follow up care addressing a patient's concerns.

470.    The agents and employees who deviated from the standard of care include nurses, physician assistants, residents and other hospital personnel who participated in Plaintiff's surgeries.

471.    The management, employees, nurses, technicians, agents and all staff during the scope of their employment and/or agency of West Chester Hospital/UC Health's knowledge and approval, either knew or should have known the surgery was not medically necessary based upon Dr. Durrani's known practices; the pre-op radiology; the pre-op evaluation and assessment; and the violation of their responsibility under the bylaws, rules, regulations and policies of West Chester Hospital/UC Health.

472.    As a direct and proximate result of the aforementioned negligence and deviation from the standard of care by the agents and employees of West Chester Hospital/UC

Health, Plaintiff sustained all damages requested in the Prayer for Relief.

## COUNT II: NEGLIGENT CREDENTIALING, SUPERVISION, AND RETENTION

473.    As described in the Counts asserted directly against Dr. Durrani, the actions of Dr. Durrani with respect to Plaintiff constitute medical negligence, lack of informed consent, battery, and fraud.

474.    West Chester Hospital/UC Health negligently credentialed, supervised, and retained Dr. Durrani as a credentialed physician, violating their bylaws and JCAHO rules by:

        a.  Allowing Dr. Durrani to repeatedly violate the West Chester Hospital/UC Health bylaws with it's full knowledge of the same;

        b.  Failing to adequately review, look into, and otherwise investigate Dr. Durrani's educational background, work history and peer reviews when he applied for and reapplied for privileges at West Chester Hospital;

        c.  Ignoring complaints about Dr. Durrani's treatment of patients reported to it by West Chester Hospital staff, doctors, Dr. Durrani's patients and by others;

        d.  Ignoring information they knew or should have known pertaining to Dr. Durrani's previous privileged time at other Cincinnati area hospitals, including Children's Hospital, University Hospital, Deaconess Hospital, Good Samaritan Hospital and Christ Hospital.

475.    The Safe Medical Device Act required entities such as West Chester Hospital/UC Health to report serious injuries, serious illnesses, and deaths related to failed medical devices to the FDA and the manufacturer; this was never done.

476.    As a direct and proximate result of the negligent credentialing, supervision, and retention of Dr. Durrani, Plaintiff sustained all damages requested in the Prayer for Relief.

**COUNT III: FRAUD**

477.    West Chester Hospital/UC Health sent out billing to Plaintiff at her home following her surgeries at West Chester Hospital.

478.    The exact dates these medical bills were sent out are reflected in those medical bills.

479.    These bills constituted affirmative representations by West Chester Hospital/UC Health that the charges related to Plaintiff's surgeries were medically appropriate and properly documented.

480.    The bills were sent with the knowledge of West Chester Hospital/UC Health that in fact Plaintiff's surgeries were not appropriately billed and documented and that the services rendered at West Chester Hospital/UC Health associated with Dr. Durrani were not appropriate.

481.    The bills sent by West Chester Hospital/UC Health to Plaintiff falsely represented that Plaintiff's surgeries were appropriately indicated, performed and medically necessary in contra-indication of the standard of care.

482.    West Chester Hospital/UC Health intentionally billed Infuse/BMP-2 and/or Puregen as "Miscellaneous" to prevent discovery of the use of Infuse/BMP-2 and/or Puregen by Plaintiffs.

483.    Plaintiff relied on the facility holding Dr. Durrani out as a surgeon and allowing him to perform surgeries at its health care facility as assurance the facility was overseeing

Dr. Durrani, vouching for his surgical abilities, and further was appropriately billing Plaintiff for West Chester Hospital/UC Health's services in association with Dr. Durrani's surgeries.

484. As a direct and proximate result of this reliance on the billing of West Chester Hospital/UC Health, Plaintiff incurred medical bills that he otherwise would not have incurred.

485. West Chester Hospital/UC Health also either concealed from Plaintiff facts they knew about Dr. Durrani, including that Infuse/BMP-2 or Puregen would be used in Plaintiff's surgery, or misrepresented to Plaintiff the nature of the surgery, and the particular risks that were involved therein.

486. West Chester Hospital/UC Health's concealments and misrepresentations regarding Infuse/BMP-2 or Puregen and the nature and risks of Plaintiff's surgeries were material facts.

487. West Chester Hospital/UC Health billed Plaintiff for "OR ALLOGRAFTS" in the amount of $4660.20; upon information and belief, the "OR ALLOGRAFTS" in Plaintiff's billing for the December 21, 2011 surgery is Infuse/BMP-2 and/or Puregen.

488. Because of its superior position and professional role as a medical service provider, West Chester Hospital/UC Health had a duty to disclose these material facts to Plaintiff and a duty to refrain from misrepresenting such material facts to Plaintiff.

489. West Chester Hospital/UC Health intentionally concealed and/or misrepresented said material facts with the intent to defraud Plaintiff in order to induce Plaintiff to undergo the surgery, and thereby profited from the surgeries and procedures Dr. Durrani performed on Plaintiff at West Chester Hospital/UC Health.

490.    Plaintiff was unaware that Infuse/BMP-2 or Puregen would be used in Plaintiff's surgeries and therefore, was unaware of the health risks of Infuse/BMP-2 or Puregen's use in Plaintiff's spine.

491.    Had Plaintiff known before Plaintiff's surgeries that Infuse/BMP-2 or Puregen would be used in Plaintiff's spine and informed of the specific, harmful risks flowing therefrom, Plaintiff would not have undergone the surgeries with Dr. Durrani at West Chester Hospital/UC Health.

492.    As a direct and proximate result of the fraud upon Plaintiff by West Chester Hospital/UC Health, Plaintiff sustained all damages requested in the prayer for relief.

## COUNT IV: SPOLIATION OF EVIDENCE

493.    West Chester Hospital/UC Health through its agents and employees, willfully altered, destroyed, delayed, hid, modified and/or spoiled ("spoiled") Plaintiff's records, emails, billing records, paperwork and related evidence.

494.    West Chester Hospital/UC Health through its agents and employees, spoiled evidence with knowledge that there was pending or probable litigation involving Plaintiff.

495.    West Chester Hospital/UC Health's conduct was designed to disrupt Plaintiff's potential and/or actual case, and did in fact and proximately cause disruption, damages and harm to Plaintiff.

## COUNT V: OHIO CONSUMER SALES PROTECTION ACT

496.    Although the Ohio Consumer Sales Protection statutes O.R.C 1345.01 et seq. exempts physicians, a transaction between a hospital and a patient/consumer is not clearly exempted.

497.    West Chester Hospital/UC Health's services rendered to Plaintiff constitute a "consumer transaction" as defined in ORC Section 1345.01(A).

498.    West Chester Hospital/UC Health omitted suppressed and concealed from Plaintiffs facts with the intent that Plaintiffs rely on these omissions, suppressions and concealments as set forth herein.

499.    West Chester Hospital/UC Health's misrepresentations, and its omissions, suppressions and concealments of fact, as described above, constituted unfair, deceptive and unconscionable acts and practices in violation of O.R.C 1345.02 and 1345.03 and to Substantive Rules and case law.

500.    West Chester Hospital/UC Health was fully aware of its actions.

501.    West Chester Hospital/UC Health was fully aware that Plaintiffs were induced by and relied upon West Chester Hospital/UC Health's representations at the time West Chester Hospital/UC Health was engaged by Plaintiffs.

502.    Had Plaintiffs been aware that West Chester Hospital/UC Health's representations as set forth above were untrue, Plaintiffs would not have used the services of Defendants.

503.    West Chester Hospital/UC Health, through its agency and employees knowingly committed the unfair, deceptive and/or unconscionable acts and practices described above.

504.    West Chester Hospital/UC Health's actions were not the result of any bona fide errors.

505.    As a result of West Chester Hospital/UC Health's unfair, deceptive and unconscionable acts and practices, Plaintiffs have suffered and continues to suffer damages, which include, but are not limited to the following:

a.  Loss of money paid

b.  Severe aggravation and inconveniences

c.  Under O.R.C. 1345.01 Plaintiffs are entitled to:

    i.  An order requiring West Chester Hospital/UC Health restore to Plaintiffs all money received from Plaintiffs plus three times actual damages and/or actual/statutory damages for each violation;

    ii.  All incidental and consequential damages incurred by Plaintiffs;

    iii.  All reasonable attorneys' fees, witness fees, court costs and other fees incurred;

## COUNT VI: PRODUCTS LIABILITY

506.  At all times Infuse/BMP-2 and Puregen are and were products as defined in R.C. § 2307.71(A)(12) and applicable law.

507.  West Chester Hospital/UC Health (aka supplier) supplied either Medtronic's (aka manufacturer) Infuse/BMP-2 or Alphatec Spine's (aka manufacturer) Puregen for surgery performed by Dr. Durrani on Plaintiff.

508.  West Chester Hospital/UC Health, as a supplier, failed to maintain either Infuse/BMP-2 or Puregen properly.

509.  West Chester Hospital/UC Health did not adequately supply all components required to use either Infuse/BMP-2 or Puregen properly.

510.  West Chester Hospital/UC Health knew or should have known the FDA requirements and Medtronic's requirements for using either Infuse/BMP-2 or Puregen.

511.    West Chester Hospital/UC Health stored either Infuse/BMP-2 or Puregen at its facility.

512.    West Chester Hospital/UC Health ordered either Infuse/BMP-2 or Puregen for surgery performed by Durrani.

513.    West Chester Hospital/UC Health did not adequately warn Plaintiff that either Infuse/BMP-2 or Puregen would be used without all FDA and manufacturer required components.

514.    West Chester Hospital/UC Health did not gain informed consent from Plaintiff for the use of either Infuse/BMP-2 or Puregen, let alone warn of the supplying of the product without FDA and manufacturer requirements.

515.    West Chester Hospital/UC Health failed to supply either Infuse/BMP-2 or Puregen (aka product) in the manner in which it was represented.

516.    West Chester Hospital/UC Health failed to provide any warning or instruction in regard to either Infuse/BMP-2 or Puregen, and failed to make sure any other party gave such warning or instruction.

517.    West Chester Hospital/UC Health intentionally billed Infuse/BMP-2 and/or Puregen as "Miscellaneous" to prevent discovery of the use of Infuse/BMP-2 and/or Puregen by Plaintiffs.

518.    Plaintiff suffered physical, financial, and emotional harm due to West Chester Hospital/UC Health's violation of the Ohio Products Liability act. Plaintiff's injuries were a foreseeable risk

519.    Plaintiff did not alter, modify or change the product, nor did Plaintiff know that the product was being implanted without all required components.

520. West Chester Hospital/UC Health knew or should have known that the product was extremely dangerous and should have exercised care to provide a warning that the product was being used and that the product was being used outside FDA and manufacturer requirements. The harm caused to Plaintiff by not providing an adequate warning was foreseeable,

521. West Chester Hospital/UC Health knew that the product did not conform to the representation of the intended use by the manufacturer yet permitted the product to be implanted into Plaintiff.

522. West Chester Hospital/UC Health, as a supplier, acted in an unconscionable manner in failing to supply the product without all FDA and manufacturer required components.

523. West Chester Hospital/UC Health, as a supplier, acted in an unconscionable manner in failing to warn Plaintiff that the product was being supplied without all FDA and manufacturer required components.

524. West Chester Hospital/UC Health's actions demonstrate they took advantage of the Plaintiffs inability, due to ignorance of the product, to understand the product being implanted without FDA and manufacturer required components.

525. West Chester Hospital/UC Health substantially benefited financially by the use of the product as the product allowed for West Chester Hospital/UC Health to charge more for the surgery.

526. Plaintiff suffered economic loss as defined in R.C. § 2303.71(A)(2) and applicable law.

527.    Plaintiff suffered mental and physical harm due to West Chester Hospital/UC Health's acts and omissions.

528.    Plaintiff suffered emotional distress due to acts and omissions of West Chester Hospital/UC Health and is entitled to recovery as defined in R.C. § 2307.71(A)(7) and applicable law.

529.    West Chester Hospital/UC Health violated the Ohio Products Liability Act R.C. § 2307.71-2307.80

530.    West Chester Hospital/UC Health violated R.C. § 2307.71(A)(6)

531.    West Chester Hospital/UC Health violated The Ohio Consumer Sales Practices Act R.C. § 1345.02-.03.

532.    West Chester Hospital/UC Health provided inadequate warnings are defined in R.C, § 2307.76(A) and applicable law.

## COUNT VII: LOSS OF CONSORTIUM

533.    At all times relevant, the Plaintiffs were married.

534.    As a result of the wrongful acts and omissions of West Chester Hospital/UC Health, Plaintiffs were caused to suffer, and will continue to suffer in the future, loss of consortium, loss of society, loss of affection, loss of assistance, and loss of conjugal fellowship, all to the detriment of Plaintiffs' marital relationship.

535.    All the aforesaid injuries and damages were caused proximately by the acts and omissions of West Chester Hospital/UC Health.

## JOURNEY LITE OF CINCINNATI, LLC COUNTS:

536.    Journey Lite owed their patient, Plaintiff, through its agents and employees the duty to exercise the degree of skill, care, and diligence an ordinarily prudent health care

provider would have exercised under like or similar circumstances.

537. Journey Lite acting through its agents and employees breached their duty by failing to exercise the requisite degree of skill, care and diligence that an ordinarily prudent health care provider would have exercised under same or similar circumstances through, among other things, negligent diagnosis, medical mismanagement and mistreatment of Plaintiff, including but not limited to improper selection for surgery, improper performance of the surgery, improper assistance during Plaintiff's surgeries and improper follow up care addressing a patient's concerns.

538. The agents and employees who deviated from the standard of care include nurses, physician assistants, residents and other hospital personnel who participated in Plaintiff's surgeries.

539. The management, employees, nurses, technicians, agents and all staff during the scope of their employment and/or agency of Journey Lite's knowledge and approval, either knew or should have known the surgery was not medically necessary based upon Dr. Durrani's known practices; the pre-op radiology; the pre-op evaluation and assessment; and the violation of their responsibility under the bylaws, rules, regulations and policies of Journey Lite.

540. As a direct and proximate result of the aforementioned negligence and deviation from the standard of care by the agents and employees of Journey Lite, Plaintiff sustained all damages requested in the Prayer for Relief.

## COUNT II: NEGLIGENT CREDENTIALING & RETENTION

541. As described in the Counts asserted directly against Dr. Durrani, the actions of Dr. Durrani with respect to Plaintiff constitute physician negligence and medical malpractice.

542. Journey Lite negligently credentialed and retained Dr. Durrani as a credentialed physician by:

       a.     Allowing Dr. Durrani to repeatedly violate the Journey Lite bylaws with it's full knowledge of the same;

       b.     Failing to adequately review, look into, and otherwise investigate Dr. Durrani's educational background, work history and peer reviews when he applied for privileges at Journey Lite;

       c.     Ignoring complaints about Dr. Durrani's treatment of patients reported to it by Journey Lite staff, Dr. Durrani's patients and by others;

       d.     Ignoring Dr. Durrani's previous privilege terminations from other Cincinnati area hospitals, including Children's Hospital, Deaconess Hospital, Good Samaritan Hospital, Christ Hospital and West Chester Hospital.

543. The Safe Medical Device Act required entities such as Journey Lite to report serious injuries, serious illnesses, and deaths related to failed medical devices to the FDA and the manufacturer; this was never done.

544. Such disregard for and violations of federal law represents strong evidence that Journey Lite negligently granted and retained privileges for Dr. Durrani.

545. As a direct and proximate result of the negligent credentialing and retention of Dr. Durrani, Plaintiff sustained severe and grievous injuries, prolonged pain and suffering, emotional distress, humiliation, discomfort, loss of enjoyment of life, and loss of ability to perform usual and customary activities and incurred substantial medical expenses and treatment that Plaintiff would not otherwise have incurred had Dr. Durrani not been credentialed by Journey Lite.

## COUNT III: FRAUD

546.    Ohio Administrative Code 3701-83-07(A)(5) states, "Each patient shall receive, if requested, a detailed explanation of facility charges including an itemized bill for services rendered.

547.    The bills sent to Plaintiff, after multiple requests, were in violation Ohio Administrative Code 3701-83-07(A)(5).

548.    Upon information and belief Plaintiff believes, based off of Plaintiff's Operative Report Records, BMP-2 was used as well as Puregen in both of Plaintiff's surgeries.

549.    Even after Plaintiff's Counsel and the Ohio Attorney General requested itemized billing, Journey Lite still did not provide an itemized breakdown of the charges; instead Journey Lite continued to provide "Account Ledgers," which contained barebones "Insurance Billing" and "Insurance Payments."

550.    Due to Journey Lite's downright refusal to comply with Plaintiff's request for itemized billing, Plaintiff has been forced to file a class action suit against Journey Lite's for their egregious billing practices.

551.    The bills sent by Journey Lite to Plaintiff falsely represented that Plaintiff's surgeries were appropriately indicated, performed, and medically necessary in contra-indication of the standard of care.

552.    Plaintiff relied on the facility holding Dr. Durrani out as a surgeon and allowing him to perform surgeries at its health care facility as assurance the facility was overseeing

Dr. Durrani, vouching for his surgical abilities, and further was appropriately billing Plaintiff for Journey Lite's services in association with Dr. Durrani's surgeries.

553. As a direct and proximate result of this reliance on the billing of Journey Lite, Plaintiff incurred medical bills that she otherwise would not have incurred.

554. Journey Lite also either concealed from Plaintiff facts they knew about Dr. Durrani, including that Infuse/BMP-2 or Puregen would be used in Plaintiff's surgery, or misrepresented to Plaintiff the nature of the surgery, and the particular risks that were involved therein.

555. Journey Lite's concealments and misrepresentations regarding Infuse/BMP-2 and Puregen and the nature and risks of Plaintiff's surgeries were material facts.

556. The use of BMP-2 increases a person's chance of cancer by 3.5%

557. Due to the unnecessary surgeries Dr. Durrani performed, Plaintiff has a 3.5% increased chance of cancer because of the use of BMP-2.

558. As a direct and proximate result of the use and implementation of Infuse/BMP-2 Plaintiff has incurred a 3.5% increase in the risk of Cancer. As a result Plaintiff has an increased fear of Cancer.

559. Because of its superior position and professional role as a medical service provider, Journey Lite had a duty to disclose these material facts to Plaintiff and a duty to refrain from misrepresenting such material facts to Plaintiff.

560. Journey Lite intentionally concealed and/or misrepresented said material facts with the intent to defraud Plaintiff in order to induce Plaintiff to undergo the surgery, and thereby profited from the surgeries and procedures Dr. Durrani performed on Plaintiff at Journey Lite.

561.    Plaintiff was unaware that Infuse/BMP-2 and Puregen would be used in Plaintiff's surgeries and therefore, was unaware of the health risks of Infuse/BMP-2 and Puregen's use in Plaintiff's spine.

562.    Had Plaintiff known before Plaintiff's surgeries that Infuse/BMP-2 and Puregen would be used in Plaintiff's spine and informed of the specific, harmful risks flowing therefrom, Plaintiff would not have undergone the surgeries with Dr. Durrani at Journey Lite.

563.    As a direct and proximate result of the fraud upon Plaintiff by Journey Lite, Plaintiff sustained all damages requested in the prayer for relief.

### COUNT IV: SPOLIATION OF EVIDENCE

564.    Journey Lite through its agents and employees, willfully altered, destroyed, delayed, hid, modified and/or spoiled ("spoiled") Plaintiff's records, emails, billing records, paperwork and related evidence.

565.    Journey Lite through its agents and employees, spoiled evidence with knowledge that there was pending or probable litigation involving Plaintiff.

566.    Journey Lite's conduct was designed to disrupt Plaintiff's potential and/or actual case, and did in fact and proximately cause disruption, damages and harm to Plaintiff.

### COUNT V: OHIO CONSUMER SALES PROTECTION ACT

567.    Although the Ohio Consumer Sales Protection statutes O.R.C 1345.01 et seq. exempts physicians, a transaction between a hospital and a patient/consumer is not clearly exempted.

568.    Journey Lite's services rendered to Plaintiff constitute a "consumer transaction" as defined in ORC Section 1345.01(A).

569.    Journey Lite omitted suppressed and concealed from Plaintiffs facts with the intent that Plaintiffs rely on these omissions, suppressions and concealments as set forth herein.

570.    Journey Lite's misrepresentations, and its omissions, suppressions and concealments of fact, as described above, constituted unfair, deceptive and unconscionable acts and practices in violation of O.R.C 1345.02 and 1345.03 and to Substantive Rules and case law.

571.    Journey Lite was fully aware of its actions.

572.    Journey Lite was fully aware that Plaintiffs were induced by and relied upon Journey Lite's representations at the time Journey Lite was engaged by Plaintiffs.

573.    Had Plaintiffs been aware that Journey Lite's representations as set forth above were untrue, Plaintiffs would not have used the services of Defendants.

574.    Journey Lite, through its agency and employees knowingly committed the unfair, deceptive and/or unconscionable acts and practices described above.

575.    Journey Lite's actions were not the result of any bona fide errors.

576.    As a result of Journey Lite's unfair, deceptive and unconscionable acts and practices, Plaintiffs have suffered and continues to suffer damages, which include, but are not limited to the following:

    a.    Loss of money paid

    b.    Severe aggravation and inconveniences

    c.    Under O.R.C. 1345.01 Plaintiffs are entitled to:

            i.    An order requiring Journey Lite restore to Plaintiffs all money received from Plaintiffs plus three times actual damages and/or actual/statutory damages for each violation;

88

    ii.   All incidental and consequential damages incurred by Plaintiffs;

    iii.  All reasonable attorneys' fees, witness fees, court costs and other fees incurred;

## COUNT VI: PRODUCTS LIABILITY

577.    At all times Infuse/BMP-2 and Puregen are and were products as defined in R.C. § 2307.71(A)(12) and applicable law.

578.    Journey Lite (aka supplier) supplied either Medtronic's (aka manufacturer) Infuse/BMP-2 or Alphatec Spine's (aka manufacturer) Puregen for surgery performed by Dr. Durrani on Plaintiff.

579.    Journey Lite, as a supplier, failed to maintain either Infuse/BMP-2 or Puregen properly.

580.    Journey Lite did not adequately supply all components required to use either Infuse/BMP-2 or Puregen properly.

581.    Journey Lite knew or should have known the FDA requirements and Medtronic's requirements for using either Infuse/BMP-2 or Puregen.

582.    Journey Lite stored either Infuse/BMP-2 or Puregen at its facility.

583.    Journey Lite ordered either Infuse/BMP-2 or Puregen for surgery performed by Durrani.

584.    Journey Lite did not adequately warn Plaintiff that either Infuse/BMP-2 or Puregen would be used without all FDA and manufacturer required components.

585.    Journey Lite did not gain informed consent from Plaintiff for the use of either Infuse/BMP-2 or Puregen, let alone warn of the supplying of the product without FDA and manufacturer requirements.

586.    Journey Lite failed to supply either Infuse/BMP-2 or Puregen (aka product) in the manner in which it was represented.

587.    Journey Lite failed to provide any warning or instruction in regard to either Infuse/BMP-2 or Puregen, and failed to make sure any other party gave such warning or instruction.

588.    Journey Lite intentionally billed Infuse/BMP-2 and/or Puregen as "Miscellaneous" to prevent discovery of the use of Infuse/BMP-2 and/or Puregen by Plaintiffs.

589.    Plaintiff suffered physical, financial, and emotional harm due to Journey Lite's violation of the Ohio Products Liability act. Plaintiff's injuries were a foreseeable risk

590.    Plaintiff did not alter, modify or change the product, nor did Plaintiff know that the product was being implanted without all required components.

591.    Journey Lite knew or should have known that the product was extremely dangerous and should have exercised care to provide a warning that the product was being used and that the product was being used outside FDA and manufacturer requirements. The harm caused to Plaintiff by not providing an adequate warning was foreseeable,

592.    Journey Lite knew that the product did not conform to the representation of the intended use by the manufacturer yet permitted the product to be implanted into Plaintiff.

593.    Journey Lite, as a supplier, acted in an unconscionable manner in failing to supply the product without all FDA and manufacturer required components.

90

594. Journey Lite, as a supplier, acted in an unconscionable manner in failing to warn Plaintiff that the product was being supplied without all FDA and manufacturer required components.

595. Journey Lite's actions demonstrate they took advantage of the Plaintiffs inability, due to ignorance of the product, to understand the product being implanted without FDA and manufacturer required components.

596. Journey Lite substantially benefited financially by the use of the product as the product allowed for Journey Lite to charge more for the surgery.

597. Plaintiff suffered economic loss as defined in R.C. § 2303.71(A)(2) and applicable law.

598. Plaintiff suffered mental and physical harm due to Journey Lite's acts and omissions.

599. Plaintiff suffered emotional distress due to acts and omissions of Journey Lite and is entitled to recovery as defined in R.C. § 2307.71(A)(7) and applicable law.

600. Journey Lite violated the Ohio Products Liability Act R.C. § 2307.71-2307.80

601. Journey Lite violated R.C. § 2307.71(A)(6)

602. Journey Lite violated The Ohio Consumer Sales Practices Act R.C. § 1345.02-.03.

603. Journey Lite provided inadequate warnings are defined in R.C, § 2307.76(A) and applicable law.

## COUNT VII: LOSS OF CONSORTIUM

604. At all times relevant, the Plaintiffs were married.

605. As a result of the wrongful acts and omissions of Journey Lite, Plaintiffs were caused to suffer, and will continue to suffer in the future, loss of consortium, loss of

society, loss of affection, loss of assistance, and loss of conjugal fellowship, all to the detriment of Plaintiffs' marital relationship.

606.    All the aforesaid injuries and damages were caused proximately by the acts and omissions of Journey Lite.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff requests and seeks justice in the form and procedure of a jury, verdict and judgment against Defendants on all claims for the following damages:

1.    Past medical bills;

2.    Future medical bills;

3.    Lost income and benefits;

4.    Lost future income and benefits;

5.    Loss of ability to earn income;

6.    Past pain and suffering;

7.    Future pain and suffering;

8.    Plaintiff seeks a finding that their injuries are catastrophic under Ohio Rev. Code §2315.18;

9.    Plaintiff seeks all relief available under the Ohio Products Liability Act R.C. § 2307.71-2307.80 and applicable law;

10.    All incidental costs and expenses incurred as a result of their injuries;

11.    The damages to their credit as a result of their injuries;

12.    Loss of consortium;

13.    Punitive damages;

14.    Costs;

92

15.     Attorneys' fees;

16.     Interest;

17.     All property loss;

18.     All other relief to which they are entitled including O.R.C. 1345.01

Based upon 1-18 itemization of damages, the damages sought exceed the minimum

jurisdictional amount of this Court and Plaintiff seeks in excess of $25,000.


Respectfully Submitted,

Matthew Hammer (0092483)
Lindsay Boese (0091307)
*Attorneys for Plaintiff*
5247 Madison Pike
Independence, KY 41051
Phone: 513-729-1999
Fax: 513-381-4084
mhammer@ericdeters.com

**JURY DEMAND**

Plaintiffs make a demand for a jury under all claims.

Matthew Hammer (0092483)
Lindsay Boese (0091307)

# UC Health

ITEMIZED BILL

11/6/2014

Page 2 of 4

O. Box 740117
ncinnati, OH 45274-0117

| Patient Name: | | Account Number | Admit Date | Discharge Date | Age | Gender |
|---|---|---|---|---|---|---|
| EELISH | ERIN | 2205728320000 | 12/21/2011 | 12/23/2011 | 25 | F |

ST CHESTER MEDICAL CENTER

GREELISH ERIN L
1915 EMORY CT
HEBRON        KY        41048

If you are paying by credit card

☐ M/C    ☐ Visa    ☐ Discover    ☐ AMEX

Card Number

Signature                        Exp Date

Show Payment Amount Here        $

rn this portion with your payment

| Service Date | Rev Code | HCPCS | Activity | Transaction Amount |
|---|---|---|---|---|
| 12/21/2011 | 00258 | | Total IV Volume (mL) | $0.00 |
| 12/21/2011 | 00258 | | Cefazolin 2 gram/NS 50 mL PB | $104.45 |
| 12/21/2011 | 00258 | | Cefazolin 2 gram/NS 50 mL PB | $104.45 |
| 12/21/2011 | 00258 | | SODIUM CHLORIDE0.9% IVSL IV 100ML 167092 | $78.60 |
| 12/21/2011 | 00270 | | SENSOR 02 ADHESIVE LAWSON #328767-70 | $21.00 |
| 12/21/2011 | 00270 | | SLEEVE DVT KNEE #189071 (Reprocessed) | $33.00 |
| 12/21/2011 | 00272 | | OR BITS/BURRS/BLADES | $358.26 |
| 12/21/2011 | 00272 | | OR MED SURG SUPPLY | $20.64 |
| 12/21/2011 | 00278 | | OR SPINAL ROD | $540.00 |
| 12/21/2011 | 00278 | | OR SPINAL SCREW | $4320.00 |
| 12/21/2011 | 00278 | | OR ALLOGRAFTS | $4660.20 |
| 12/21/2011 | 00305 | 81025 | POC HCG QUAL:URINE | $47.00 |
| 12/21/2011 | 00320 | 72020 | DIAG C SPINE SINGLE VIEW | $254.00 |
| 12/21/2011 | 00320 | 76001 | DIAG FLOURO > 1 HOUR | $754.00 |
| 12/21/2011 | 00360 | | OR - CONTR SVC - EACH ADDL MINUTE | $9919.00 |
| 12/21/2011 | 00360 | | OR - CONTR SVC - 1ST HALF HOUR | $9696.00 |
| 12/21/2011 | 00370 | | AN - COMPLEX - 1ST HALF HOUR | $636.00 |
| 12/21/2011 | 00370 | | AN - COMPLEX - EACH ADDITIONAL MINUTE | $2398.00 |
| 12/21/2011 | 00636 | J1100 | DEXAMETHASONE 4MG/ML INJECTION 5ML | $23.30 |
| 12/21/2011 | 00636 | J1170 | HYDROMORPHONE HCL 2MG/ML DIS SYR INJ | $28.05 |
| 12/21/2011 | 00636 | J2270 | MORPHINE SULFATE 1MG/ML VIAL INJ | $87.90 |
| 12/21/2011 | 00636 | J1100 | Dexamethasone 4mg/ml Injection 1ml | $22.65 |
| 12/21/2011 | 00636 | J3010 | FENTANYL 250 MCG/5 ML AMP INJ | $27.75 |
| 12/21/2011 | 00636 | J2370 | PHENYLEPHRINE HCL 10MG/ML VIAL 1 ML | $50.05 |
| 12/21/2011 | 00636 | J1170 | HYDROMORPHONE HCL 1MG/ML DIS SYR INJ | $55.40 |
| 12/21/2011 | 00636 | J0330 | SUCCINYLCHOL CL 20MG/ML VIAL INJ | $26.75 |
| 12/21/2011 | 00636 | J2250 | MIDAZOLAM 1MG/ML 2ML VIAL | $25.40 |
| 12/21/2011 | 00636 | J2405 | ONDANSETRON HCL 2MG/ML VIAL IV | $22.25 |
| 12/21/2011 | 00636 | Q0175 | PERPHENAZINE 4MG TAB PO | $6.15 |

24

# ERIN GREELISH
## AFFIDAVIT OF MERIT
## JOURNEY LITE OF CINCINNATI, LLC

I, Keith D. Wilkey, M.D., after being duly sworn and cautioned states as follows:

1. I devote at least one-half of my professional time to the active clinical practice in my field of licensure, or its instruction in an accredited school. I am an orthopedic surgeon whose focus is on spine surgery and treatment of those with spine issues.

2. I will supplement this affidavit with another, by a letter or by testimony, based upon any information provided to me after I execute it.

3. My curriculum vitae has been previously provided to opposing counsel in these Dr. Durrani cases and can be provided again upon request. For my review, I rely upon my education, training and experience.

4. I have not counted but I have reviewed, over 50 or more cases involving Dr. Durrani and the hospitals where he once had privileges.

5. I base my opinions in part on my review of all the cases I have reviewed which have revealed similar conduct by Dr. Durrani and the hospitals where he had privileges.

6. I am familiar with applicable standard of care for Ohio, Kentucky and the country for an orthopedic/spine surgeon such as Dr. Durrani.

7. I am also familiar with applicable standard of care, policies, rules and regulations, medical executive committee bylaws, JCAHO requirements, credentialing, supervising, retention of medical staff, granting and rejecting privileges and the peer review process for Journey Lite (hereafter JL).

8. I have reviewed all relevant medical records including radiology of Dr. Durrani's medical treatment of Erin Greelish and the medical treatment of Erin Greelish at JL.

9. The Center for Advanced Spine Technologies, Inc. was Dr. Durrani's practice group and he was the sole owner, director and officer of CAST as well as an employee. CAST as such is also responsible for Dr. Durrani's negligence and for their failure to also supervise, discipline and retain Dr. Durrani.

10. I have also reviewed the nursing summary prepared by legal counsel's office for Erin Greelish. Based upon the number of cases I've reviewed pertaining to Dr. Durrani, legal counsel's office knows what materials I need to review and provides me those materials. In addition, while this affidavit contains case specific

information; it also contains information relevant to this case and/or many and/or most and/or all the other cases. It is prepared for me by counsel with my direction and approval like all of these have been.

11. Based upon my review, the following are the **facts** I rely upon:

A. Erin Greelish was a 35 year old, married, mother of six children on the day of the first cervical surgery by Dr. Durrani in December 2011. Erin was very active with her six children and all of their activities including the last two being twins who are now six year old. Erin was referred to Dr. Durrani in June 2011 because of her headaches and lower back pain 8/10 and Ehlers-Danlos Syndrome (EDS). Erin had been treated by her PCP, Dr. Gina Grove and Clinical Geneticist, Dr. Bradley Tinkle and Rheumatologist, Dr. Christopher Colglazier over the years.

B. PMH - Ehlers-Danlos Syndrome, Bruxism, Headaches , Incontinence and a non--smoker. Erin has treated for hypoxemia, high blood pressure, chest pain and breathlessness. Erin had a Cardiology Clearance pre-operatively. Surgical history - Tubal Ligation, Tendon surgery, Fractured Femur.

C. 6/20/11 MRI and CT Scan were done with conflicting reports according to Dr. Durrani's office notes. See answer to question #2 for details below.

D. 6/21/11 -- Saw Dr. Durrani for an evaluation of severe headaches at the base of her skull and with certain pressure she would black out. At the first visit, Dr. Durrami showed Erin her scan results on his computer and scared her to the core. Dr. Durrani told Erin that "her head rotates 85% off of her spine" at the C1-C2 joint and that she would require surgery to stabilize this joint and possibly at the occiput as well. Dr. Durrani also informed Erin there were multiple other joints in her spine that were clearly in various stages of degeneration as well which would require surgery in the future.

E. 7/8/11 - Erin decided to seek a second opinion as Dr.Colglazier had recommended from the Mayfield Clinic. She saw Dr. Barry Skidmore, Orthopedic surgeon who did not feel the need for surgery but explained he was not knowledgeable EDS. Based on that opinion and feeling that Dr. Durrani had the expertise, along with Dr. Durrani telling her of the potentially deadly nature of an "internal decapitation" Erin felt she had no choice but to proceed with the fusion surgery.

F. Erin states Dr. Durrani did not mention or educate her in regards to the usage of any cementation such as Auto or Allograft or the placement of a cage. Erin feels strongly that Dr. Durrani deliberately used her EDS against her to frighten her into thinking that she could die or be critically injured if she did not go through

2

with the probable needless #1 and #2 surgeries. Dr. Durrani did not recommend any conservative treatments except for a block for her pain.

G. 12/21/11 – Dr. Durrani performed the cervical surgery informing Erin afterwards that he was only able to stabilize one side because her of the way the veins were situated in one part of her neck but she would be fine because he had used some bone slurry which would fuse into the joint as well. Erin was discharged three days later to home in excruciating pain with pain medication, a muscle relaxant and instructions to follow up Dr. Durrani. Erin was told no physical therapy would help. About a week later, Erin called into the office indicating the wound seemed to be infected and with that she was prescribed an antibiotic. The pain decreased in intensity as the incision healed but within a matter of a few months the pain returned as it was pre-operatively.

H. 3/6/12 - in a letter to Dr. Tinkle, Dr. Durrani states Erin is doing absolutely awesome at this point from C1-C2 fusion when in reality, Erin states she has not had any relief of the preoperative pain.

I. Returning to Dr. Durrani for the increased pain at the previous fusion, Dr. Durrani informed Erin it was C5-6 that was causing her pain. He also stated that her previous fusion C1-2 was fusing well. Erin states based on Dr. Durrani's expertise she did not question him and proceeded with the surgery which was scheduled at JourneyLite of which she felt somewhat suspicious about since it was a weight loss surgical facility. Erin states at this JourneyLite, her experience with the anesthesia was not pleasant because she could hear the physician's voices but could not move or tell them so. She does say she was knocked out before any cutting took place. This anesthesia experience has made Erin very fearful of ever having any more surgeries of any kind.

J. Erin realizes that some of her neck pain was from the EDS but as a result of the probable unnecessary surgeries the neck and shoulder pain 8/10 she now experiences is life lasting. She continues to have numbness and tingling in her right arm especially at night when she feels as though her shoulder subluxates/dislocates at night while lying on that side and then improves once she changes position.

K. 9/11/12 in a letter to Dr. Tinkle, Dr. Durrani notes the MRI of the Cervical spine shows a very large hernia at C5-C6 which flexion/extension images actually pinches onto the spinal cord and causing effacement of the ventral thecal sac. The C1-C2 images show that there is excellent fusion at the C1-C2 area and there is no rotary instability at that level, C1-C2.

3

L. *There are no Radiology Reports in this file to support Dr. Durrani's interpretation for this time period.*

M. On 11/16/12 Dr. Durrani completed surgery #2 @ JourneyLite.

N. Erin has not gone back to see Dr. Durrani because she feared he would try to talk into more surgeries as he had indicated earlier that she would need in the future.

O. #1 and #2 surgeries were not needed according to the Radiology exams as indicated below.

**P. Dr. Durrani's misinterpretation of the pre-operative diagnostic:**
**6/20/11**- CT Cervical Spine w/o Contrast w/ 3D Rotational Study @ Proscan Imaging
Findings: Craniocervical junction is normal without evidence of C1-@ instability. The atlantodens interval is normal.
        C5-6, C6-7: shallow central disc displacements indent the thecal sac without cord compression, central canal stenosis or foraminal stenosis.
Conclusion: 1) Physiologic and symmetric C1-2 rotation without subluxation.
        2) No compressive cervical disocpathy.    **(Included)**

**6/21/11** – MRI Cervical Spine w/o Contrast w/Flexion & Extension
Conclusion: 1) Reversal of normal cervical lordosis with shallow ventral disc displacement C5-6, C6-7 without cord compression, central canal stenosis or foraminal stenosis.
2) No evidence of C1-2 instability.  The atlantodens interval is normal.
3) No subluxations.
Addendum: When comparison is made with previous CT written report and images dated 6/20/11, again no C1-2 instability is noted. The disc displacements as described above are more conspicuous on the MRI examination. **(included)**

**6/21/11** – In a letter to Dr. Bradley Tinkle, Geneticist, Dr. Durrani documents the MRI of the cervical spine shows a large disk herniation between C5 and C6. That the rotational study of C1 and C2 were evaluated showing 80-85% uncoverage between articulation just from looking between right and left.  The dens remains within 2mm between flexion and extension (Grubbs Oaks distance is 2mm)..  Dr. Durrani states this clearly shows C1-C2 rotatory instability as evidenced in EDS population.

Q. It was on the first office visit that Dr. Durrani recommended surgery for the first cervical surgery.

**R. Dr. Durrani performed two surgeries on this client:**
#1 Surgery – 12/21/11 @ West Chester Medical Center

4

**PREOPERATIVE & POSTOPERATIVE DIAGNOSES:  SAME**
C1 – C2 Instability status post EDS Syndrome
    **PROCEDURES:**
- C1 – C2 Posterior Spinal Instrumentation
- C1 –C2 Posterior Spinal Fusion using Auto & Allograft

*Informed Consent is for **C1-C2 Fusion**, it does not mention Posterior spinal instrumentation or the usage of Auto or Allograft. This Consent is only signed by the patient with no witness or Dr. Durrani's signature.*

#2 Surgery – 11/16/12 @ JourneyLite
    **PREOPERATIVE & POSTOPERATIVE DIAGNOSES:  SAME**
- Cervical Disk Herniation, C5-C6
- Cervical Spinal Stenosis, C5-C6
- Bilateral Foraminal Stenoses, C5-C6
- Cervical Radiculopathy, C5-C6 bilaterally

 **PROCEDURES:**
- Anterior Cervical Discectomy, C5-C6
- Anterior Cervical Fusion using Allograft
- Placement of Anterior Interbody Cage, C5-C6
- Anterior Cervical Instrumentation C5-C6

*Informed Consent reads **C5-6 ACDF,** it does not mention Placement of Anterior Interbody Cage, instrumentation per se' or usage of Allograft. It is signed by the patient and Dr. Durrani.*

S. BMP-2 was used in the following surgery:  For Surgeries #1 it was listed as INFUSE and for #2 surgery it was Alphatec (Puregen)

T. The following hardware was implanted:
    #1 Surgery – 2/21/11
- 1 – INFUSE Bone Graft X Sm 1.4ml – Medtronic
- 1 – ACTIFUSE Bone Graft Shape 90X25X7 – Apatech
- 2 – Screw FA MNTR 3.5X26mm Tl – Depuy Spine
- 2 – Screw XConn Innr Nut Mntr Tl – Depuy Spine
- 1 – Rod Spine Mntr 3.5X60mm Tl – Depuy Spine

    #2 Surgery - 11/16/12
- 1 – Alphatec
- 1 – Alphatec Cervical Plate
- 1 – Grafton Putty 1cc

- 4 – Screws – assume Alphatec not actually documented Alphatec
- 2 – Spacer – assume Alphatec not actually documented Alphatec

U.  Off-Label Use: #1 Surgery was a posterior approach. #2 Surgery was anterior approach with an anterior interbody cage.

V.  Operative Report Dictations:

#1 Surgery was dictated by Dr. A. Durrani on 12/21/11 and verified by Dr. Durrani on 2/3/12 (44 days later).
    #2 Surgery was dictated by Dr. A. Durrani on 11/16/12 and verification was not documented in the file.

W.  There was no noted failed hardware.

X.  7/8/11 - Erin sought Dr. Skidmore's opinion at the Mayfield Clinic who had given her a conflicting report telling her that he did not see the need for surgery regarding #1 surgery. She did not see anyone else regarding the second surgery.

Y.  Since Erin's second surgery with Dr. Durrani she has been feeling worst than before the first surgery and continues to experience pain 7-8/10 and on bad days it increases to 8/10.

Z.  Erin's quality of life has diminished to fair as a result of the Dr. Durrani surgeries. She feels now that perhaps she would not still be having neck pain 7-8/10 and the shoulder discomfort if she had not had either one of the surgeries. She understands the EDS would still be causing some discomfort but not to the extent she is experiencing presently on a daily basis.
Walking – was not a major problem preoperatively as it is now. Nowadays if she and her husband plan to do activities requiring any walking distance she has to taken in the wheelchair.
Sitting – had not been a problem until the surgeries and currently she sits in a recliner-type chair with pillows to give her head and neck support that reduces the neck stress and strain reducing the pain 8/10 encountered just by being an upright position. She is only able to tolerate about 45-60 minutes at any given time in a chair without head support.
Standing – had not been a problem as it is currently, with a 20 minute duration at any given time.
Laying down – is limited to her right side only. She only manages to lie on her back for about 10 minutes then she has to turn on the right side.
Sleeping – she is able to fall asleep but then awakens every two hours to readjust her position.

Lifting – has been reduced to about 10 lbs or less. She doesn't attempt to overdo it because she will pay with increased pain if she does.

Household chores – she is able to do the dishes and vacuum. Her teenage daughter carries the laundry baskets for her. Her husband does all the grocery shopping and lawn care needs. She does all of her clothes shopping on-line. She is able to dress and shower herself alone.

Cooking – she accomplishes by spacing out the preparation that's needed. i.e. crockpot or oven but she gives her husband credit for doing a lot of grilling of which he enjoys.

Erin still manages to attend to her six year old twins who still require a great deal of her time and attention. She is now able to rest more since they are in the first grade currently.

Driving – is done very cautiously because she is not able to turn her head from left to right. She has to turn her whole body when looking for the oncoming traffic usually get assistance from the older children as to when it's safe to pull out. She only drives occasionally and when absolutely necessary.

Flexion – she is able to bend at the waist but not able to bend her neck forward or backward. When needed she compromises by leaning forward.

AA.     Erin continues to experience on a daily basis sharp neck pain 8/10 radiating across her shoulders with numbness and tingling down her arms and in her fingers. Erin says she is still having the same base of her skull headache/neck pain as she had on the first day she met Dr. Durrani.

BB.     Erin seems to be fairly positive and is adapting to the life style she has been dealt. She feels the quantity of quality time spent with her husband has been reduced significantly because after his day's work he has to come home and spend time doing the things she use to be able to do instead of spending this time together as before. She is not happy with her present situation and considers her quality of life to be only fair.

12. Based upon my review, the following are my **opinions** based upon a reasonable degree of medical certainty pertaining to the deviation in standard of care or negligence, informed consent, battery and fraud claims against Dr. Durrani and JL which proximately caused harm to Plaintiff:

A. Need to have additional surgery to repair problems created by Dr. Durrani

B. Implantation of BMP-2 without informed consent

C. Failed hardware

D. Failure to obtain proper informed consent for surgery

E. Failure to provide adequate and thorough pre-operative and post-operative patient surgical education

F. Failure to properly post-op monitor the patient

G. Failure to properly perform follow up, post-op care

H. Negligent surgical techniques

I. Failure to maintain accurate and complete surgical records and surgical consent forms

J. Failure to disclose important health information to patient

K. Failure to maintain and complete discharge summary

L. Failure to supervise Dr. Durrani

M. Negligent pre-surgical diagnosis

N. Failure to prepare a timely operative report or other medical record

O. Billing for services not completed

P. Not informing the patient another surgeon will be doing all or part of the surgery

Q. Practicing outside Dr. Durrani's scope of training, education, experience, and Board certifications

R. Deviation in standard of care

S. Failure to perform thorough and accurate pre-op nonsurgical evaluation

T. Failure by Dr. Durrani to inform patient of additional/changed procedure and reason

U. Failure by CAST to disclose additional/changed procedure and reason to patient

V. Failure by Dr. Durrani at CAST to properly educate patient regarding diagnosis

W. Prior knowledge of possible complication and not acting properly upon same

X. Failure to disclose pertinent health information to another health care provider

Y.  Fraudulent, negligent and reckless pre-operative work up

Z.  Fraudulent, negligent and reckless surgery

AA.  Inaccurate, fraudulent, and/or exaggeration of diagnoses

BB.  Failure to properly educate patient regarding diagnoses

CC.  Failure to attempt non-surgical conservative treatment

DD.  Failure to perform thorough and accurate pre-op nonsurgical evaluation

EE.  Failure by Dr. Durrani at JL to perform accurate and complete preoperative teaching

FF. Failure by Dr. Durrani at JL to properly educate   patient regarding diagnoses

GG.  Failure by Dr. Durrani at JL to maintain accurate and/or complete medical records

HH.  Failure of informed consent by Dr. Durrani at JL

II.  Failure of JL to insure Dr. Durrani and CAST had obtained proper informed consent

JJ. Failure of JL to obtain proper acknowledgement of consent

KK.  Failure by Dr. Durrani at JL to disclose pertinent health information

LL. Failure by JL to disclose additional/changed procedure and reason to patient

MM.  Failure by JL to supervise staff

NN.  Failure by JL staff to properly document abnormalities and follow up care

OO.  Non-approved hardware combinations

PP. Dr. Durrani made false and material misrepresentations of material facts intended to mislead Erin Greelish and concealed material facts he had a duty to disclose.  JL and CAST concealed material facts they had a duty to disclose.  Erin Greelish was justified in relying on the misrepresentation and did rely proximately causing harm to Erin Greelish.  Dr. Durrani and JL intentionally misled Erin Greelish.  Erin Greelish had the right to correct information.

13.     Based upon my review of the deposition testimony, the JCAHO requirements, the MEC bylaws and all the information provided to me, I am able to adopt the following opinions relating to JL pertaining to the claims against them. JL's actions and inactions detailed in this affidavit proximately caused harm to Plaintiff. JL are both being referenced when only JL is named. I hold the following opinions relative to JL pertaining to their conduct acting through their administration and MEC. The time period covered is from the time Dr. Durrani joined JL until he left by August 2013. In addition to my opinions, I set forth facts I rely upon. This includes all which I referenced that I reviewed. In addition to all of the above, I attest to the following:

1. JL's motive for their actions and inactions towards Dr. Durrani was financial gain.

2. The MEC, administration and Boards of JL failed to "govern the affairs of the Medical Staff."

3. The MEC, administration and Boards of JL failed to enforce their rules upon Dr. Durrani as they were required to do.

4. The MEC, administration and Boards of JL failed to provide oversight of Dr. Durrani as they were required to do.

5. The MEC, administration and Boards of JL failed to properly evaluate Dr. Durrani.

6. The Orthopedic and Surgery Departments abdicated their responsibility under the MEC bylaws to review, investigate and supervise Dr. Durrani.

7. The MEC, administration and Boards of JL failed to properly discipline Dr. Durrani including summary suspensions and revocation.

8. The MEC, administration and Boards of JL failed to properly discipline under the MEC bylaws as it pertains to Dr. Durrani.

9. The MEC, administration and Boards of JL ignored the information readily available pertaining to Dr. Durrani before credentialing and granting him privileges.

10. The MEC, administration and Boards of JL failed to act on Dr. Durrani's disruptive behavior, unprofessional behavior and clinical performance placing Plaintiff at risk.

11. The MEC, administration and Boards of JL certified and approved the unnecessary procedures of Dr. Durrani on Plaintiff knowing they were

unnecessary and knowingly allowing the improper use of BMP-2 and/or PureGen and knowing there was not proper informed consent.

12. The MEC, administration and Boards of JL failed to act on Dr. Durrani's failure in medical record documentation.

13. The MEC, administration and Boards of JL failed to require Dr. Durrani to follow the rules for off label experimental procedures.

14. The MEC, administration and Boards of JL allowed Dr. Durrani to use undisclosed and unqualified surgeons to perform his surgeries including fellows and interns.

15. The MEC, administration and Boards of JL allowed Dr. Durrani to do multiple surgeries at once.

16. JL have refused to provide as privileged the peer review information from JL for Dr. Durrani to either me or their own expert. Therefore, we have no knowledge of what action, if any, was taken against him. However, based upon the facts here, it is obvious they failed to take action.

17. Based upon all of the above, it's my opinion that JL were negligent in their credentialing, supervising, disciplining and retaining Dr. Durrani on staff and allowing him to obtain and keep privileges at JL under the standards of Ohio and this proximately caused harm to Plaintiff.

18. The facts support Erin Greelish's claim for negligence, battery, lack of consent and fraud.

19. As a result of the negligence and conduct of Dr. Durrani and JL Erin Greelish suffered damages proximately caused by them, including the following:

    A. Permanent disability
    B. Physical deformity and scars
    C. Past, Current and Future Physical and Mental Pain and Suffering
    D. Lost income past, present and future
    E. Loss of enjoyment of life
    F. Past medical expenses
    G. Future medical expenses approximately in the amount of $50,000 to $250,000 depending on course of treatment
    H. Aggravation of a pre-existing condition
    I. Decreased ability to earn income
    J. 3% increased risk of cancer and fear of cancer if BMP-2 was used.

AFFIANT SAYETH FURTHER NOT

_____
KEITH D. WILKEY, M.D.

NOTARY

SUBSCRIBED, SWORN TO AND ACKNOWLEDGED before me, a Notary Public, by

Keith D. Wilkey, M.D. on this ____ day of October, 2014.

Angela Kay Poinsett

NOTARY PUBLIC

My Commission Exp.: 07/18/2015

St Charles County

State of Missouri

ANGELA POINSETT
Notary Public - Notary Seal
State of Missouri
Commissioned for St. Charles County
My Commission Expires: July 18, 2015
Commission Number: 11133613



## COMMON PLEAS COURT
## HAMILTON COUNTY, OHIO

Erin & Jeffrey Greelish
_____

_____

VS

Abubakar Atiq Durrani, MD, et al.
_____

_____

CASE NO. _____ A 1 6 0 1 5 3 9 ____

WRITTEN REQUEST FOR SERVICE
TYPE OF PAPERS TO BE SERVED ARE

Complaint & AOM
_____

(☐) PLEASE CHECK IF THIS IS A
DOMESTIC CASE

PLAINTIFF/DEFENDANT REQUESTS:

CERTIFIED MAIL SERVICE <u>X</u>_____

PERSONAL SERVICE _____

PROCESS SERVICE _____

EXPRESS MAIL SERVICE _____

REGULAR MAIL SERVICE _____

RESIDENCE SERVICE _____

FOREIGN SHERIFF _____

ON West Chester Hospital, LLC, Serve: GH&R Business Svcs., Inc.
_____

511 Walnut Street, 1900 Fifth Third Center Cincinnati, OH 45202
_____

UC Health, Serve: GH&R Business Svcs., Inc., 511 Walnut Street,
_____

1900 Fifth Third Center, Cincinnati, OH 45202
_____

Journey Lite of Cincinnati, LLC, Serve: CT Corporation System, 1300 East
_____

Ninth Street, Cleveland, OH 44114
_____

_____

_____

Matthew J. Hammer
_____

ATTORNEY

5247 Madison Pike Independence, KY 41051
_____

ADDRESS

859-363-1900
_____

PHONE NUMBER

92483
_____

ATTORNEY NUMBER

# COURT OF COMMON PLEAS
## HAMILTON COUNTY, OHIO

REQUEST AND INSTRUCTIONS FOR ORDINARY MAIL SERVICE

**Erin & Jeffrey Greelish**

Plaintiff

-vs-

**Abubakar Atiq Durrani, MD, et al.**

Defendant

INSTRUCTIONS TO THE CLERK

A 1 6 0 1 5 3 9

CASE NUMBER: _____

**IF SERVICE OF PROCESS BY CERTIFIED MAIL IS RETURNED BY THE POSTAL AUTHORITIES WITH AN ENDORSEMENT OF "REFUSED" OR "UNCLAIMED" AND IF THE CERTIFICATE OF MAILING CAN BE DEEMED COMPLETE NOT LESS THAN FIVE (5) DAYS BEFORE ANY SCHEDULED HEARING, THE UNDERSIGNED WAIVES NOTICE OF THE FAILURE OF SERVICE BY THE CLERK AND REQUESTS ORDINARY MAIL SERVICE IN ACCORDANCE WITH CIVIL RULE 4.6 (C) OR (D) AND CIVIL RULE 4.6 (E).**

**Matthew J. Hammer**

ATTORNEY OF RECORD                    (TYPE OR PRINT)

**\s\Matthew J. Hammer**

_____

DATE                                           ATTORNEY'S SIGNATURE

FILED
2016 MAR 15 P 1:47
CLERK OF COURTS
HAMILTON COUNTY, OH